## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| POSCO, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) Court No. 16-00227 |
| UNITED STATES, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT

POSCO ("Plaintiff") by and through counsel, alleges herein as follows:

## JURISDICTION

1. Plaintiff brings this action pursuant to Sections 516A(a)(2)(A)(i) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, *as amended* ("the Act"), 19 U.S.C. §§ 1516a(a)(2)(A)(i) and (a)(2)(B)(i).  This action is an appeal of the U.S. Department of Commerce's ("Commerce") amended final determination in the countervailing duty ("CVD") investigation covering hot-rolled steel flat products from Korea.  *See Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea:  Final Affirmative Determination*, 81 Fed. Reg. 53,439 (Dep't Commerce Aug. 12, 2016), amended by *Certain Hot-Rolled Steel Flat Products From Brazil and the Republic of Korea:  Amended Final Affirmative Countervailing Duty Determinations and Countervailing Duty Orders*, 81 Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) ("*Amended Final Determination* and *Order*").

2. This Court has jurisdiction by reason of 28 U.S.C. § 1581(c).

## STANDING

3. Plaintiff, POSCO, is a producer and exporter of hot-rolled steel from Korea.

1

4.      Plaintiff was a party to the underlying CVD investigation and participated in the investigation by filing questionnaire responses, participating in verification, filing case and rebuttal briefs, and filing ministerial error comments. Therefore, Plaintiff is an "interested party" pursuant to 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(A). As an "interested party" that actively participated in the proceeding below, Plaintiff has standing to commence this action under 19 U.S.C. § 1516a(a)(2)(A), 19 U.S.C. § 1516a(d), 28 U.S.C. § 2631(c), and 28 U.S.C. § 1581(c).

## TIMELINESS OF THIS ACTION

5.      On October 3, 2016, Commerce published in the *Federal Register* the challenged *Amended Final Determination* and *Order*. Plaintiff filed a summons initiating this appeal on October 20, 2016, pursuant to Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Act, 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i), which was within thirty (30) days of publication of the *Amended Final Determination* and *Order* in the *Federal Register*. This action was therefore timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II), 28 U.S.C. § 2636(c), and Court of International Trade Rule 3. This complaint is being filed on November 14, 2016, which is within 30 days of the filing of the summons and is thus timely under Court of International Trade Rule 3(a)(2).

## STATEMENT OF FACTS

6.      On August 11, 2015, the domestic industry filed a petition with Commerce and the U.S. International Trade Commission alleging, *inter alia*, that Korean hot-rolled steel producers were receiving unlawful subsidies from the Government of Korea ("GOK"). Commerce initiated a CVD investigation on August 31, 2015. Commerce selected POSCO and

Hyundai Steel as the mandatory respondents and issued the initial questionnaire to both mandatory respondents on September 24, 2015.

7. As part of its initial questionnaire, Commerce asked a series of questions about any companies that are affiliated with POSCO to determine if they may be considered to be "cross-owned" with POSCO. According to the instructions in the questionnaire, which conform to Commerce's regulations: "Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other." *See also* 19 C.F.R. § 351.525(b)(6)(vi). The questions regarding cross-ownership were asked in order to determine if there were any POSCO affiliated companies that may be required to submit complete questionnaire responses so that Commerce could attribute any subsidy received by the cross-owned affiliate to the combined sales of POSCO and the cross-owned affiliate.

8. According to the instructions in the questionnaire, POSCO needed to submit a complete questionnaire response for those affiliates where "cross-ownership" exists and also where one of the following situations applies: (1) the cross-owned company produces the subject merchandise; or (2) the cross-owned company is a holding company or a parent company (with its own operations) of the respondent; or (3) the cross-owned company supplies an input product for production of the downstream product produced by the respondent; or (4) the cross-owned company has received a subsidy and transferred it to the respondent. These four situations come straight from Commerce's attribution regulations. *See* 19 C.F.R. § 351.525(b)(6)(ii) thru (v). However, with regard to situation (3), the regulations also provide

that production of the input product must be "'*primarily dedicated*' to the production of the downstream product. . . ." *Id.* at (b)(6)(iv) (emphasis added).

9. The *Preamble* to Commerce's CVD regulations provides additional guidance regarding the attribution of subsidies received by cross-owned input suppliers to the respondent company and the "primarily dedicated" requirement. Specifically, the *Preamble* states that in cases where input suppliers provide inputs that are "dedicated almost exclusively to the production of a higher value added product . . . {,} the purpose of a subsidy provided to the input producer is to benefit the production of both the input and downstream products." *Countervailing Duties: Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Nov. 25, 1998) ("*Preamble*"). Such subsidies should thus be attributed to the respondent company. However, where inputs are not "primarily dedicated" to the production of downstream products, Commerce noted that "it is not reasonable to assume that the purpose of a subsidy to the input product is to benefit the downstream product," and therefore subsidies received by cross-owned input suppliers whose inputs are not primarily dedicated to the production of the downstream product should not be attributed to respondent companies. *Id*.

10. In order to determine whether products are "primarily dedicated" to the production of the downstream product and, therefore, determine whether any benefits received by input suppliers should be attributed to the responding company, Commerce in some of its recent cases has evaluated whether these inputs represent a significant part of the cross-owned affiliates' total sales. *See, e.g.*, *Large Residential Washers From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 75,975 (Dep't Commerce Dec. 26, 2012), and accompanying Issues and Decision Memorandum at 3. If the inputs provided to the

4

respondent accounted for an insignificant amount of the input producer's total sales, then Commerce did not attribute any subsidies received by the input producer to the respondent. *Id.*

11.     POSCO submitted its response to the affiliation and cross-ownership section of the questionnaire on October 13, 2015.  POSCO's response provided a list of POSCO's cross-owned affiliates, including a brief description of their business, and also its consolidated financial statement that listed the amount of sales and purchases between POSCO and its cross-owned affiliates as well as the total sales value for its cross-owned affiliates.  Relying upon its understanding of Commerce's regulations and practice regarding cross-owned input suppliers, POSCO did not believe that any of its cross-owned affiliates provided inputs that were "primarily dedicated" to the production of the downstream product because the inputs provided by these affiliates did not account for a significant percentage of the affiliates' total sales, nor did the inputs account for a significant part of POSCO's cost of production.  POSCO thus reported in its response that:  "There were no cross-owned companies located in Korea that provided inputs to POSCO's production of subject merchandise."  POSCO did not submit questionnaire responses for any cross-owned affiliates.  No further questions were asked by Commerce about POSCO's cross-owned affiliates.

12.     Commerce also investigated certain alleged benefits provided to companies located in Industrial Complexes and Free Economic Zones ("FEZs").  In its initial questionnaire response, POSCO reported that it "has no facilities located in a free economic zone ('FEZ') and thus was not eligible for and did not receive any tax reductions, exemptions, grants or financial support under any of the three programs listed in the Department's question."  The GOK confirmed in its initial questionnaire response that "{d}uring the investigation period, none of the respondents received an{y} benefit under this program."

13.     POSCO also reported in its initial questionnaire response that Daewoo International Corporation ("DWI"), an affiliated trader for which POSCO provided a full questionnaire response,[1] had received certain loans from the Korea Resource Development Corporation ("KORES") for certain overseas investments.  In a subsequent supplemental response, POSCO provided a full response regarding DWI's receipt of these loans at the request of Commerce and reported certain loans it had received from KORES.

14.     After it became apparent during the verification in the cold-rolled steel from Korea investigation that Commerce might determine that POSCO should have submitted responses for certain cross-owned affiliates despite its past practice and regulations, POSCO twice attempted to submit information related to these cross-owned input suppliers.  POSCO also attempted to disclose in these submissions that it had a Global R&D Center located in an FEZ, but reported that it did not receive any benefits based on its location therein.  In one of these submissions. POSCO additionally attempted to disclose that, in addition to the KORES loans it had already reported for DWI, it had inadvertently omitted certain additional loans from this reporting.  This information was submitted as part of POSCO's response to a new subsidy investigation questionnaire and supplemental questionnaire which, although not specifically asking questions about these particular issues, were questionnaires in which Commerce was continuing to collect new factual information.  In both instances, Commerce rejected the submission, requesting that POSCO remove the information related to the cross-owned input suppliers, the R&D center, and DWI's additional KORES loans and resubmit its response.

---

[1] POSCO submitted a complete questionnaire response for DWI because it was cross-owed with POSCO and acted as a trading company that exported POSCO subject merchandise to the United States during the investigation period.  Trading companies are also another category of affiliates that are required to submit complete questionnaire responses.  *See* 19 C.F.R. § 351.525(c). POSCO does not contest that DWI was properly required to submit a complete questionnaire response.

6

15. On January 8, 2016, Commerce issued the preliminary negative determination in which it calculated a 0.17 percent *ad valorem* subsidy for POSCO, which was *de minimis*.

16. Commerce conducted verification of POSCO and DWI between May 16 and 19, 2016. During verification, Commerce requested and was provided a list of all raw material inputs that could be used by POSCO to produce subject merchandise and a list of POSCO's suppliers for many of these inputs along with the purchased amounts of these inputs during the period of investigation. POSCO is a fully integrated steel producer and thus produces iron, which is then used to produce all different kinds of steel products, including the subject hot-rolled steel. The raw material list thus showed that several of POSCO's cross-owned affiliates had provided small amounts of certain raw material inputs that could be used to produce iron that is then used to produce various products, including the subject merchandise. This list was taken by Commerce as a verification exhibit.

17. In its minor corrections provided to Commerce at the start of verification, POSCO disclosed that, during preparation for verification, it found that it did have a facility – its Global R&D Center – located in an FEZ.

18. Commerce also conducted a separate verification of DWI. At the start of that verification, DWI presented minor corrections to Commerce and reported that it had received certain additional KORES loans that were not reported in its questionnaire response. Although DWI had reported certain KORES loans in its questionnaire response, DWI had mistakenly believed that they only needed to report "success-contingent" loans and not all general loans from KORES. The minor correction attempted to provide the additional general loans that had inadvertently not been reported in DWI's response. Commerce did not accept this as a minor correction.

19. Commerce subsequently issued its verification report for POSCO. As part of its verification, Commerce had asked POSCO officials how they determined whether an affiliate needed to submit a questionnaire response. The reported notes as follows:

> The official then continued on how it determined if any POSCO affiliate needed to provide a response. The next criteria used to identify cross-owned affiliates was to determine whether any of the companies were parent or holding companies and found none. Then they determined whether any of the companies provided any inputs that could be used to produce subject merchandise or the downstream product, and whether the inputs were primarily dedicated. In order to determine which inputs were primarily dedicated, they looked at the value of the input supplied by the affiliated company. If the value of the input was small, either relative to POSCO's cost of sales or relative to the total value of the affiliated companies' sales, they determined that it was not primarily dedicated.

Commerce then noted that it selected certain affiliated companies from the list of input suppliers and requested additional explanation of their business scope, ownership percentages, and articles of incorporation.

20. Commerce noted that POSCO presented as a minor correction that it had discovered during its preparation for verification that it had a Global R&D Center located in an FEZ. This was the same facility identified by POSCO in the submissions rejected by Commerce.

21. Finally, Commerce also noted that DWI presented a minor correction that it did not accept; namely, that DWI had additional unreported KORES loans. It further stated that it did not verify these loans.

22. The parties filed case briefs on July 14, 2016. In its case brief, the petitioner Nucor argued, among other matters, that Commerce should apply AFA amounting to 550.95 percent because POSCO purportedly withheld information regarding certain cross-owned input suppliers, failed to disclose the location of an R&D facility in an FEZ, failed to report all KORES loans for DWI, and for the GOK's alleged omission of one loan from its questionnaire response.

8

23. POSCO argued that any issues raised as a result of the verification report should not impact the rates established in the preliminary determination because, *inter alia*, the cross-owned input suppliers identified in Commerce's verification report were not required to submit complete questionnaire responses because the inputs they provided to POSCO were not primarily dedicated to the production of the downstream product. As support, POSCO provided calculations using record information showing that the value of the inputs sold to POSCO was not significant as a percentage of these affiliates' total sales to all customers and that the inputs purchased by POSCO from these input suppliers was insignificant as a percentage of POSCO's total cost of sales. POSCO also argued that there was no basis to apply any AFA for POSCO not reporting for these affiliates because its decision not to submit complete responses for these cross-owned input suppliers was objectively reasonable and was based on its interpretation of "primarily dedicated" in Commerce's regulations and in its recent cases.

24. On July 20, 2016, the parties submitted rebuttal briefs. In its rebuttal brief, POSCO argued that record evidence showed that the sales of inputs purchased by POSCO from POSCO Chemtech Company, Ltd. ("Chemtech"), POSCO Processing and Service ("POSCO P&S"), POSCO M-Tech Co., Ltd. ("POSCO M-Tech"), and POS-HiMetal Co. Ltd. ("POS-HiMetal") all constituted an insignificant percentage of the input suppliers' total sales. Therefore, these input suppliers did not provide inputs that were "primarily dedicated" to the production of the downstream product in accordance with Commerce's regulations, stated methodology, and past practice, and thus subsidies received by these input suppliers should not be attributed to POSCO. POSCO argued that it therefore did not fail to provide complete responses for input suppliers under 19 C.F.R. § 351.525(b)(6)(iv) and so Commerce did not have a basis to apply AFA for a failure to respond for these input suppliers. POSCO also opposed the

9

use of AFA for its mistake in not reporting the R&D facility's location in an FEZ, the mistake in not reporting all of DWI's KORES loans, and the GOK's omission of one loan received by POSCO.

25. In its rebuttal brief, Nucor reiterated its arguments for the application of AFA for POSCO not submitting responses for its cross-owned input suppliers, for not reporting the location of one of its R&D facilities in an FEZ, and for DWI's failure to report all of its KORES loans.

26. Commerce issued its Final Determination on August 4, 2016. In its accompanying Issues and Decision Memorandum, Commerce stated that it determined that POSCO had failed to provide responses for certain cross-owned input suppliers. Based on this determination, Commerce concluded as AFA that inputs produced by POSCO Chemtech, POSCO P&S, POSCO M-Tech, and POS-HiMetal were primarily dedicated to the production of the downstream product, within the meaning of 19 C.F.R. 351.525(b)(6)(iv). *See* Final Determination Issues and Decision Memorandum ("*Final Determination IDM*") at Comment 5. Commerce additionally determined as AFA that POSCO and its cross-owned input suppliers received subsidies, benefited from these subsidies, and that these subsidies were specific for all programs that were initiated upon and investigated by Commerce. Finally, Commerce noted that it also applied AFA to POSCO for its failure to report that one of its facilities is located in an FEZ and for DWI's failure to report the KORES loans it attempted to disclose in its minor corrections. *See Final Determination IDM* at 11.

27. To establish AFA rates for the alleged programs, Commerce stated in its Issues and Decision Memorandum that it used the following methodology, in accordance with its standard practice:

> It is the Department's practice in CVD proceedings to compute an AFA rate for non-cooperating companies using the highest calculated program-specific rates determined for a cooperating respondent in the same investigation, or, if not available, rates calculated in prior CVD cases involving the same country. Specifically, the Department applies the highest calculated rate for the identical subsidy program in the investigation if a responding company used the identical program, and the rate is not zero. If there is no identical program match within the investigation, or if the rate is zero, the Department uses the highest non-*de minimis* rate calculated for the identical program in a CVD proceeding involving the same country. If no such rate is available, the Department will use the highest non-*de minimis* rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country. Absent an above-*de minimis* subsidy rate calculated for a similar program, the Department applies the highest calculated subsidy rate for any program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies. *Id.* at 11-12.

28. In applying this methodology, where available Commerce used the above zero rates calculated for identical programs for the other mandatory respondent, Hyundai Steel, in this investigation, and then applied a 1.05 percent rate established in *Washers from Korea* for all tax programs and a 1.64 percent rate established in *Refrigerators from Korea* for all other programs. *Id.* at 15-17. Commerce did not specifically state how these rates from *Washers from Korea* and *Refrigerators from Korea* fit into its stated methodology, but it appears that these were considered to be the highest calculated subsidy rates for any program from any case on products from Korea that could conceivably be used by POSCO. Commerce did not explain why it was appropriate based on the facts and circumstances of this investigation to apply the highest calculated rates in Korea to POSCO. The total AFA rate that Commerce applied to POSCO in the *Final Determination* was 57.04 percent.

29. On August 12, 2016, POSCO submitted a ministerial error letter alleging that Commerce's application of its AFA methodology was not in accordance with its past practice or stated methodology. Specifically, POSCO alleged that Commerce applied AFA to certain programs it explicitly identified as not countervailable; that it did not follow its stated

11

methodology as there were above-*de mimimis* rates calculated for the same program in other proceedings that Commerce did not rely on; and that Commerce relied upon rates not calculated for cooperating respondents, as required by Commerce's AFA methodology.

30. On August 23, 2016, Commerce issued a ministerial error memorandum in which it largely rejected POSCO's ministerial error allegations and instead found that it had made a ministerial error in inadvertently not including a benefit for one of the programs. The net result was that Commerce actually further increased POSCO's AFA margin by another 1.64 percent for this program. POSCO's subsidy rate thus increased from 57.04 percent to 58.68 percent.

31. This appeal followed.

## STATEMENT OF CLAIMS

### Count One

32. Paragraphs 1 to 31 are incorporated by reference.

33. Commerce's decision to apply AFA to POSCO for not submitting responses for certain cross-owned affiliates is not supported by substantial evidence and is otherwise not in accordance with law because POSCO's decision not to report for these companies was based on an objectively reasonable interpretation of Commerce's regulations and practice regarding the attribution of subsidies received by cross-owned input suppliers.

### Count Two

34. Paragraphs 1 to 33 are incorporated by reference.

35. Commerce's use of the highest calculated rates in Korea for programs that could have conceivably been used by POSCO as the AFA rates applied to POSCO is not supported by substantial evidence because Commerce did not evaluate the facts and circumstances that

resulted in the use of AFA and explain why the situation warranted the use of the highest rates as required by 19 U.S.C. § 1677e(d)(2).

### Count Three

36. Paragraphs 1 to 35 are incorporated by reference.

37. Commerce's established AFA CVD methodology, which automatically defaults to the highest rates calculated, is not in accordance with law because it is inconsistent with 19 U.S.C. § 1677e(d)(2), which requires Commerce to evaluate the facts and circumstances that led it to apply an adverse inference.

### Count Four

38. Paragraphs 1 to 37 are incorporated by reference.

39. Commerce's determination that it did not have to corroborate the AFA rates applied to POSCO because the AFA rates it used were calculated in previous Korean CVD investigations or reviews is not in accordance with law and Commerce's use of these uncorroborated AFA rates to calculate POSCO's margin is unsupported by substantial evidence.

### Count Five

40. Paragraphs 1 to 39 are incorporated by reference.

41. Commerce's decision to apply AFA for POSCO's error in not reporting that one of its R&D facilities was in an FEZ is not supported by substantial evidence and is not in accordance with law because the GOK reported that none of the mandatory respondents, including POSCO, received any FEZ benefits.

## **Count Six**

42. Paragraphs 1 to 41 are incorporated by reference.

43. Commerce's rejection of minor corrections submitted by POSCO's affiliated trading company, DWI, was not supported by substantial evidence and is not in accordance with law because the corrections were to information regarding a program that had already been reported by DWI and would have resulted in the calculation of the most accurate margin.

**DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

    a.    Hold that Commerce's *Final Determination* and *Amended Final Determination* and *Order* are not supported by substantial evidence and are otherwise not in accordance with law;

    b.    Remand this case to Commerce for a re-determination consistent with the judgment and findings of this Court; and

    c.    Grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ Donald B. Cameron
Donald B. Cameron
Julie C. Mendoza
R. Will Planert
Brady W. Mills
Eugene Degnan
Mary S. Hodgins
Sarah S. Sprinkle

MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4811

*Counsel to POSCO*

Dated: November 14, 2016

10294577 v1