Slip Op. 18-117

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **POSCO,** | |
| **Plaintiff,** | |
| **and** | |
| **NUCOR CORPORATION,** | |
| **Consolidated Plaintiff,** | |
| **v.** | **Before: Jennifer Choe-Groves, Judge** |
| **UNITED STATES,** | **Consol. Court No. 16-00227** |
| **Defendant,** | |
| **and** | |
| **STEEL DYNAMICS, INC., AK STEEL CORPORATION, ARCELORMITTAL USA LLC, UNITED STATES STEEL CORPORATION, HYUNDAI STEEL COMPANY, and GOVERNMENT OF KOREA,** | |
| **Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final determination following a countervailing duty investigation of certain hot-rolled steel flat products from the Republic of Korea.]

Dated: September 11, 2018

Donald B. Cameron and Brady W. Mills, Morris, Manning & Martin LLP, of Washington, D.C., argued for Plaintiff POSCO and Defendant-Intervenors Hyundai Steel Company and the Government of Korea. With them on the brief were Julie C. Mendoza, R. Will Planert, Mary S. Hodgins, and Eugene Degnan. Sabahat Chaudhary also appeared.

Adam M. Teslik and Christopher B. Weld, Wiley Rein LLP, of Washington, D.C., argued for
Consolidated Plaintiff and Defendant-Intervenor Nucor Corporation.  With them on the brief was
Alan H. Price.  Cynthia C. Galvez, Derick G. Holt, Laura El-Sabaawi, Maureen E. Thorson,
Stephanie M. Bell, Tessa V. Capeloto, Timothy C. Brightbill, and Usha Neelakantan also
appeared.

Renee A. Burbank, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S.
Department of Justice, Washington, D.C., argued for Defendant United States.  With her on the
brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director,
and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Emma T. Hunter,
Attorney, Office of Chief Counsel for Trade Enforcement & Compliance, U.S. Department of
Commerce.

Melissa M. Brewer, Kelley Drye & Warren, LLP, of Washington, D.C., for Defendant-
Intervenor ArcelorMittal USA LLC.  Kathleen W. Cannon, Paul C. Rosenthal, R. Alan Luberda,
and Scott M. Wise also appeared.

Daniel L. Schneiderman, King & Spalding, LLP, of Washington, D.C., for Defendant-Intervenor
AK Steel Corporation.  With him on the brief was Stephen A. Jones.

Roger B. Schagrin and Christopher T. Cloutier, Schagrin Associates, of Washington, D.C., for
Defendant-Intervenor Steel Dynamics, Inc.  Elizabeth J. Drake, John W. Bohn, and Paul W.
Jameson also appeared.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C.,
for Defendant-Intervenor United States Steel Corporation.  Formerly on the brief were Jeffrey D.
Gerrish and Luke A. Meisner, Skadden Arps Slate Meagher & Flom LLP, of Washington, D.C.

        Choe-Groves, Judge:  This case involves certain hot-rolled steel flat products from the

Republic of Korea ("Korea").  Plaintiff POSCO and Consolidated Plaintiff Nucor Corporation

("Nucor") bring this action contesting various aspects of the final determination in a

countervailing duty investigation, in which the U.S. Department of Commerce ("Commerce" or

"Department") found that countervailable subsidies are being provided to producers and

exporters of certain hot-rolled steel flat products from Korea.  See Countervailing Duty

Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 81 Fed.

Reg. 53,439 (Dep't Commerce Aug. 12, 2016) (final affirmative determination), <u>as amended</u>, 81

Fed. Reg. 67,960 (Dep't Commerce Oct. 3, 2016) (amended final affirmative countervailing duty

determination and countervailing duty order); <u>see also</u> Issues and Decision Memorandum for the

Final Determination in the Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat

Products from the Republic of Korea, C-580-884, (Aug. 4, 2016), <u>available at</u>

https://enforcement.trade.gov/frn/summary/korea-south/2016-19377-1.pdf (last visited Sept. 5,

2018) ("Final IDM").  This matter is before the court on Plaintiff POSCO's Rule 56.2 motion for

judgment on the agency record and Consolidated Plaintiff Nucor's Rule 56.2 motion for

judgment on the agency record challenging various aspects of the Department's final

determination.  <u>See</u> Pl. POSCO's Mot. J. Agency R., June 1, 2017, ECF No. 54; Pl. POSCO's

Br. Supp. Mot. J. Agency R., June 1, 2017, ECF No. 54-2 ("POSCO's Mot."); Pl. Nucor

Corporation & Pl.-Intervenors ArcelorMittal USA LLC, AK Steel Corporation, & United States

Steel Corporation's Rule 56.2 Mot. J. Agency R., June 1, 2017, ECF No. 56 ("Nucor's Mot.").

## ISSUES PRESENTED

The court reviews the following issues:

1.      Whether Commerce properly applied facts otherwise available with an adverse

        inference ("adverse facts available" or "AFA") against POSCO with respect to

        POSCO's four cross-owned affiliates;

2.      Whether Commerce properly rejected factual information submitted at

        verification regarding POSCO's affiliated trading company, Daewoo International

        Corporation;

3.      Whether Commerce properly applied adverse facts available against POSCO with respect to POSCO's facility located in a free economic zone;

4.      Whether Commerce properly selected the highest rates when applying adverse facts available;

5.      Whether Commerce properly corroborated the adverse facts available rates used;

6.      Whether Commerce properly determined that the Government of Korea's provision of electricity to respondents was not for less than adequate remuneration;

7.      Whether Commerce properly determined not to take into account information regarding the Korea Power Exchange ("KPX");

8.      Whether Commerce properly determined that the Government of Korea's provision of electricity is consistent with market principles; and

9.      Whether Commerce properly declined to apply facts otherwise available with an adverse inference against the Government of Korea.

**PROCEDURAL HISTORY**

Nucor, AK Steel Corporation, ArcelorMittal USA LLC, Steel Dynamics Inc., and United States Steel Corporation (collectively, "Petitioners") filed a petition with Commerce concerning imports of hot-rolled steel flat products from Korea. See Decision Memorandum for the Preliminary Negative Determination: Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea at 1, C-580-884, (Jan. 8, 2016), available at https://enforcement.trade.gov/frn/summary/korea-south/2016-00750-1.pdf (last visited Sept. 5, 2018) ("Prelim. IDM").  Commerce initiated a countervailing duty investigation into certain hot-

rolled steel flat products from Korea on September 9, 2015.  See id.; see also Certain Hot-Rolled

Steel Flat Products From Brazil, the Republic of Korea, and Turkey, 80 Fed. Reg. 54,267 (Dep't

Commerce Sept. 9, 2015) (initiation of countervailing duty investigations).  The investigation

named two entities, POSCO and Hyundai Steel Co., Ltd. ("Hyundai Steel"), as mandatory

respondents.  See Prelim. IDM at 2.

POSCO submitted a questionnaire response related to Daewoo International Corporation

("Daewoo"), a trading company affiliated with POSCO.  See id. at 9; POSCO and Daewoo

International Corporation's Response to the Affiliated Companies Questions of Commerce's

Sept. 24, 2015 Initial Questionnaire, PD 74, bar code 3404843-01 (Oct. 13, 2015).  Daewoo is

majority-owned by POSCO and exported POSCO-produced subject merchandise into the United

States during the period of investigation.  See Prelim. IDM at 9.

Commerce also issued an initial questionnaire to the Government of Korea, seeking

information about how electricity prices in Korea are set and how the Korean Electric Power

Corporation's ("KEPCO") costs are reflected in its electricity rates.  See Commerce's Initial

Countervailing Duty Questionnaire, PD 46–47, bar code 3308604-01 (Sept. 24, 2015).

Commerce issued its preliminary determination on January 15, 2016.  See Countervailing

Duty Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 81

Fed. Reg. 2,172 (Dep't Commerce Jan. 15, 2016) (preliminary negative determination and

alignment of final determination with final antidumping duty determination) ("Preliminary

Results").  The Department found that POSCO and Daewoo are cross-owned through common

ownership as defined in 19 C.F.R. § 351.525(b)(6)(vi).  See Prelim. IDM at 9.  Commerce

determined preliminarily that the Government of Korea's provision of electricity was not for less

than adequate remuneration and did not confer a benefit to the respondents.  See id. at 33.  In

reaching this result, Commerce analyzed whether the pricing set by KEPCO was consistent with

market principles based on the "Tier Three" benchmark analysis set forth in Commerce's

regulations.  See id. at 31–33.  Under the Tier Three benchmark analysis, Commerce determined

preliminarily that KEPCO applied the same price-setting method (standard pricing mechanism)

to calculate the electricity rates for each tariff classification, that there was no information that

the Korean producers were treated differently from other industrial users of electricity

purchasing comparable amounts, and that this program provided no benefit to the Korean

producers.  See id. at 32–33.  Commerce calculated a de minimis rate for both POSCO and

Hyundai Steel.  Preliminary Results, 81 Fed. Reg. at 2,172–73.  Nucor submitted subsequent pre-

verification comments.  See Nucor's Pre-Verification Comments for the Government of Korea,

PD 349, bar code 3461986-01 (Apr. 21, 2016).

        Between the publication of the Preliminary Results and verification, POSCO attempted to

provide additional factual information to the Department.  See POSCO's Response to

Commerce's Apr. 26, 2016 Supplemental New Subsidy Allegation Questionnaire (Rejected and

Retained by Commerce), CD 364, bar code 3466175-01 (May 3, 2016).  The Department

rejected the submission as untimely.  See Commerce's Letter to POSCO Regarding POSCO's

May 3, 2016 Questionnaire Response, PD 384, bar code 3466187-01 (May 3, 2016);

Commerce's Rejection of Document Memorandum, PD 385, bar code 3466188-01 (May 3,

2016).  Commerce conducted verifications of the questionnaire responses submitted by the

Government of Korea, POSCO, and Hyundai Steel from May 9 through May 20, 2016.  See

Final IDM at 2.

Commerce issued its final determination on August 12, 2016.  See Countervailing Duty

Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 81 Fed.

Reg. at 53,439.  The Department found that POSCO failed to provide information about its

cross-owned companies.  See Final IDM at 9.  It subsequently applied adverse facts available to

POSCO and found, as AFA, that those companies provided inputs used in the production of

certain hot-rolled steel flat products during the period of investigation.  See id.  Commerce

applied AFA to POSCO for its failure to report that one of its facilities is located in a free

economic zone and for Daewoo's failure to report certain loans.  See id.  Commerce selected and

applied AFA rates from two previous countervailing duty investigations involving Korea:

Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea, 77 Fed. Reg.

17,410 (Dep't Commerce Mar. 26, 2012) (final affirmative countervailing duty determination),

and Large Residential Washers From the Republic of Korea, 77 Fed. Reg. 75,975 (Dep't

Commerce Dec. 26, 2012) (final affirmative countervailing duty determination).  See Final IDM

at 11–17.  The Department continued to find, pursuant to its Tier Three benchmark analysis, that

the Government of Korea's provision of electricity did not benefit POSCO or Hyundai Steel, was

not for less than adequate remuneration, and was not countervailable.  See id. at 25, 44–50.

Commerce assigned POSCO a final subsidy rate of 57.04 percent.  Countervailing Duty

Investigation of Certain Hot-Rolled Steel Flat Products From the Republic of Korea, 81 Fed.

Reg. at 53,439.

POSCO then submitted ministerial error comments to Commerce.  See POSCO and

POSCO Daewoo Corporation's Ministerial Error Allegation, PD 446, bar code 3497444-01

(Aug. 12, 2016).  POSCO alleged that Commerce had made an error in selecting and applying

the AFA rates for POSCO.  Id. at 3–4.  Commerce stated that most of POSCO's arguments were

about methodological decisions rather than ministerial errors, but adjusted one of the AFA rates

based on an error Commerce discovered itself.  See Commerce's Response to Ministerial Error

Comments at 2, PD 450, bar code 3500934-01 (Aug. 23, 2016).  Commerce assigned an

amended final subsidy rate of 58.68 percent to POSCO.  See Certain Hot-Rolled Steel Flat

Products From Brazil and the Republic of Korea, 81 Fed. Reg. at 67,961.

   POSCO and Nucor initiated separate proceedings in this court, which the court

consolidated.  See Order, Feb. 8, 2017, ECF No. 46.  Pursuant to the motions for judgment on

the agency record filed by the Parties, the court held oral argument on April 18, 2018.  See Oral

Argument, Apr. 18, 2018, ECF No. 93; see also Transcript of Oral Argument, May 2, 2018, ECF

No. 95.

**JURISDICTION AND STANDARD OF REVIEW**

   The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).[1]  The court "shall hold

unlawful any determination, finding or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

---

[1] All further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of
Title 19 of the U.S. Code.  All further citations to the U.S. Code are to the 2012 edition, with
exceptions.  All further citations to 19 U.S.C. § 1677e are to the 2015 version, as amended
pursuant to the Trade Preferences Extension Act of 2015, Pub. L. No. 114–27, 129 Stat. 362
(2015).  All citations to the Code of Federal Regulations are to the 2015 edition.

## ANALYSIS

**I.      POSCO's Rule 56.2 Motion for Judgment on the Agency Record**

The court begins by addressing POSCO's Rule 56.2 motion for judgment on the agency record.  POSCO contests several issues stemming from Commerce's application of adverse facts available to POSCO in the final determination.  For the following reasons, the court grants in part and denies in part POSCO's motion.

**A.  Legal Standard**

Pursuant to the Tariff Act, Commerce has the authority to conduct countervailing duty investigations and to determine whether "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States."  19 U.S.C. § 1671(a)(1).  Countervailing subsidies "exist when (1) a foreign government provides a financial contribution (2) to a specific industry and (3) a recipient within the industry receives a benefit as a result of that contribution."  Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369 (citing 19 U.S.C. § 1677(5)(B)).

Section 776 of the Tariff Act provides that if "necessary information is not available on the record" or if a respondent "fails to provide such information by the deadlines for submission of the information or in the form and manner requested," then the agency shall "use the facts otherwise available in reaching" its determination.  19 U.S.C. §§ 1677e(a)(1), (a)(2)(B).  If the Department finds further that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information" from the agency, then the Department

"may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." Id. § 1677e(b)(1)(A).  The U.S. Court of Appeals for the Federal Circuit has interpreted these two subsections to have different purposes.  See Mueller Comercial de Mexico, S. de R.L. De C.V. v. United States, 753 F.3d 1227, 1232 (Fed. Cir. 2014).  Subsection (a) applies "whether or not any party has failed to cooperate fully with the agency in its inquiry."  Id. (citing Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1346 (Fed. Cir. 2011)).  On the other hand, subsection (b) applies only when the Department makes a separate determination that the respondent failed to cooperate "by not acting to the best of its ability."  Id. (quoting Zhejiang DunAn Hetian Metal Co., 652 F.3d at 1346).

When determining whether a respondent has complied to the "best of its ability," Commerce "assess[es] whether [a] respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  Nippon Steel v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  This finding requires both an objective and subjective showing.  Id.  Commerce must determine objectively "that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations."  Id. (citing Ta Chen Stainless Steel Pipe, Inc. v. United States, 298 F.3d 1330, 1336 (Fed. Cir. 2002)).  Next, Commerce must demonstrate subjectively that the respondent's "failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records."  Id. at 1382–83.  Adverse inferences are not warranted "merely from a failure to respond," but rather in instances when the Department reasonably

expected that "more forthcoming responses should have been made." Id. at 1383. "The statutory

trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to

the best of respondent's ability, regardless of motivation or intent." Id.

Commerce may rely on information derived from the petition, a final determination in the

investigation, a previous administrative review, or any other information placed on the record

when making an adverse inference. See 19 U.S.C. § 1677e(b)(2); 19 C.F.R. § 351.308(c).

The Department's prior practice for selecting the AFA rate was to apply a hierarchical

methodology. See Essar Steel, Ltd. v. United States, 753 F.3d 1368, 1371 (Fed. Cir. 2014).

Commerce first applied the highest rate calculated for an identical program from any segment of

the proceeding. See id.; Final IDM at 11–12. If such a rate did not exist or was de minimis,

Commerce then applied the highest rate for a similar program. See Essar Steel, 753 F.3d at

1371; Final IDM at 12. The Trade Preferences Extension Act of 2015 codified Commerce's

prior practice for selecting an AFA rate. See 19 U.S.C. § 1677e(d)(1); POSCO v. United States,

42 CIT __, __, 296 F. Supp. 3d 1320, 1349 (2018). When selecting an AFA rate in a

countervailing duty proceeding, the revised statute allows Commerce to:

> (i) use a countervailable subsidy rate applied for the same or similar program in a
>     countervailing duty proceeding involving the same country; or
>
> (ii) if there is no same or similar program, use a countervailable subsidy rate for a
>      subsidy program from a proceeding that the administering authority considers
>      reasonable to use.

19 U.S.C. § 1677e(d)(1)(A). The Department may select the highest rate available based on an

evaluation of the situation leading to the application of AFA. Id. § 1677e(d)(2). Under the

recent amendment, Commerce is no longer required to estimate what the countervailing subsidy

rate would have been if the respondent cooperated nor to demonstrate that the selected rate

reflects the "commercial reality of the interested party." Id. § 1677e(d)(3)(B).

Commerce's duty to corroborate remains the same under the Trade Preferences

Extension Act.  If the Department relies on secondary information (e.g., information not

"obtained in the course of an investigation or review"), the statute requires that Commerce, "to

the extent practicable, corroborate that information from independent sources that are reasonably

at their disposal." 19 U.S.C. § 1677e(c)(1).  The Department is not required to corroborate a

countervailing duty rate "applied in a separate segment of the same proceeding." Id.

§ 1677e(c)(2).

> **B.   Commerce's Application of Adverse Facts Available to POSCO for Not Reporting That Four Cross-Owned Affiliates Provided Inputs That Could Be Used to Produce the Downstream Product**

19 C.F.R. § 351.525 sets forth how Commerce calculates *ad valorem* subsidy rates and

attributes subsidies to products.  If cross-ownership exists "between an input supplier and a

downstream producer, and production of the input product is primarily dedicated to production

of the downstream product," the Department "will attribute subsidies received by the input

producer to the combined sales of the input and downstream products produced by both

corporations," excluding sales between the two companies.  19 C.F.R. § 351.525(b)(6)(iv).  The

regulation defines cross-ownership as "where one corporation can use or direct the individual

assets of the other corporation(s) in essentially the same ways it can use its own assets." Id.

§ 351.525(b)(6)(vi).  This definition is typically met "where there is a majority voting ownership

interest between two corporations or through common ownership of two (or more) corporations."

Id.

Commerce found in the instant investigation that POSCO failed to report that several affiliated companies had provided inputs that could be used to produce hot-rolled steel, and therefore Commerce applied AFA in the Final Determination.  See Final IDM at 9, 12.  The four cross-owned affiliates at issue are POSCO Chemtech, POSCO P&S, POSCO M-Tech, and POS-HiMetal.  See Commerce's Verification Report for POSCO and Daewoo at 5, PD 413, bar code 3483994-01 (July 5, 2016).  The companies supply POSCO with limestone, scrap, ferro-molybdenum, and high purity ferromanganese, respectively.  See id.  As AFA, Commerce determined that the inputs produced by these affiliates were primarily dedicated to the production of the downstream product within the meaning of 19 C.F.R. § 351.525(b)(6)(iv).  See Final IDM at 12, 65.

POSCO argues that Commerce's decision to apply AFA is improper because POSCO did not fail to cooperate and it acted to the best of its abilities within the meaning of the statute. Plaintiff contends that its failure to report the four cross-owned affiliates was based on its "objectively reasonable belief" that it was not required to report.  See POSCO's Mot. 18. POSCO asserts that even if the court agrees that POSCO should have reported the companies initially, the facts here support only the application of "neutral facts available," not AFA, because its two attempts to submit information to Commerce constitute evidence that it acted to the best of its ability.  See id. at 20; see also Reply Br. Pl. POSCO Supp. Mot. J Agency R. 9, Oct. 25, 2017, ECF No. 74.  The court finds POSCO's arguments unpersuasive.

Commerce has regulations dictating the time limits to which respondents should adhere when submitting factual information.  See 19 C.F.R. §§ 351.301, 351.302.  Commerce found that POSCO's new submission fell under 19 C.F.R. § 351.301(c)(5), which meant that the submission

should have been filed 30 days before the preliminary determination was issued.  Because

POSCO attempted to provide the information after the preliminary determination was issued,

Commerce rejected the filing as untimely.  See Commerce's Letter to POSCO Regarding

POSCO's May 3, 2016 Questionnaire Response at 1–2, PD 384, bar code 3466187-01 (May 3,

2016).  The court finds that Commerce's action here was reasonable and in accordance with the

regulation.

      Commerce has discretion in setting and enforcing the time frame for investigations as a

part of its mandate to administer the antidumping duty law.  See Yantai Timken Co., Ltd. v.

United States, 31 CIT 1741, 1755, 521 F. Supp. 2d 1356, 1370–71 (2007) (citing Reiner Brach

GmbH & Co.KG v. United States, 26 CIT 549, 559, 206 F. Supp. 2d 1323, 1334 (2002)).  The

record indicates clearly that POSCO did not timely disclose the existence of its four cross-owned

affiliates to Commerce in its initial questionnaire response.  See POSCO and Daewoo's

Response to Commerce's Sept. 24, 2015 Initial Questionnaire, PD 92, bar code 3413150-01

(Nov. 3, 2015).  POSCO admits this point, but argues that it chose not to disclose based on its

interpretation of Commerce's regulations.  Respondents should be forthcoming with information,

regardless of their views on relevancy, in the event the agency finds differently.  See POSCO, 42

CIT at __, 296 F. Supp. 3d at 1340–41 (citing Essar Steel Ltd. v. United States, 34 CIT 1057,

1073, 721 F. Supp. 2d 1285, 1299 (2010)).  POSCO failed to provide Commerce with

information at the outset of the investigation, and therefore Commerce's decision to apply AFA

was reasonable.  See Nippon Steel, 337 F.3d at 1383 (holding that "intentional conduct, such as

deliberate concealment or inaccurate reporting" shows a failure to cooperate); Essar Steel Ltd. v.

United States, 678 F.3d 1268, 1275–76 (Fed. Cir. 2012) (finding that "[p]roviding false

information and failing to produce key documents unequivocally" shows that respondent "did

not put forth its maximum effort"); Maverick Tube Corp. v. United States, 857 F.3d 1353, 1360

(Fed. Cir. 2017) (concluding that substantial evidence supports Commerce's decision to apply

AFA where respondent failed to provide information requested by Commerce and "never

claimed that it was unable to provide").

Plaintiff contends that Commerce's decision to find as AFA that the inputs produced by

POSCO's cross-owned affiliates were primarily dedicated to the production of the downstream

product is unsupported by substantial evidence, and relies on Changzhou Trina Solar Energy Co.,

Ltd. v. United States, 40 CIT __, __, 195 F. Supp. 3d 1334, 1347 (2016) ("Trina Solar"), to

bolster its argument.  See POSCO's Mot. 12–18.  In Trina Solar, Commerce failed to identify

any evidence to support its AFA findings, and the court held that Commerce must justify such

determinations with information on the record.  Trina Solar, 40 CIT at __, 195 F. Supp. 3d at

1347–48.  The facts are distinguishable from the instant case.  Commerce determined in this

investigation that POSCO Chemtech, POSCO P&S, POSCO M-Tech, and POS-HiMetal were

affiliated input providers based on information available in the record.  The record shows that

POSCO owns significant percentages of the four companies, and that the four companies supply

raw materials that could have been conceivably used in the subject merchandise.  See Final IDM

at 61–62; POSCO and Daewoo International Corporation's Response to the Affiliated

Companies Questions of Commerce's Sept. 24, 2015 Initial Questionnaire at Ex. 1, PD 74, bar

code 3404843-01 (Oct. 13, 2015).  Substantial evidence supports Commerce's decision to apply

AFA to POSCO for its failure to report information about its affiliated input providers.  Based on

the facts in the record and the applicable law, the court concludes that Commerce applied AFA

properly to POSCO on this issue.

POSCO disputes Commerce's rejection of factual information submitted by Daewoo at

verification regarding loans that Daewoo received.  See POSCO's Mot. 38–39.  Commerce

rejected the information on the basis that it did not constitute a minor correction.  See Final IDM

at 72.  Because the court sustains Commerce's application of adverse facts available to POSCO

for the company's failure to report the four discovered input suppliers, this issue is moot.

### C.  Commerce's Decision to Apply Adverse Facts Available for POSCO's Failure to Provide Information About a Free Economic Zone

POSCO reported in its initial questionnaire response that it did not have any facilities

located in a free economic zone.  POSCO and Daewoo's Response to Commerce's Sept. 24,

2015 Initial Questionnaire at 45, PD 92, bar code 3413150-01 (Nov. 3, 2015).  POSCO later

submitted a correction to Commerce, stating that it has a global research and development center

in Songdo International City, which is located in the Incheon Free Economic Zone.  See POSCO

and Daewoo's Minor Corrections, PD 398, bar code 3469938-01 (May 18, 2016).  Commerce

applied AFA as a result and attributed the receipt of certain additional benefits to POSCO.  See

Final IDM at 69.

POSCO contends that Commerce's decision to apply AFA with respect to this issue is

unsupported by substantial evidence.  See POSCO's Mot. 35–38.  The court disagrees.  POSCO

stated originally that it did not have any facilities located in a free economic zone, but filed

contradictory information after Commerce released the verification agenda in this investigation.

Compare POSCO and Daewoo's Response to Commerce's Sept. 24, 2015 Initial Questionnaire

at 45, PD 92, bar code 3413150-01 (Nov. 3, 2015) with POSCO and Daewoo's Minor

Corrections at 4, PD 398, bar code 3469938-01 (May 18, 2016).  In support of this statement,

POSCO attached a printout of its website that discusses this center in Songdo International City.

See POSCO and Daewoo's Minor Corrections at Attach. 3, PD 398, bar code 3469938-01 (May

18, 2016).  It is difficult to believe that POSCO did not have this information at the outset, and it

was reasonable for Commerce to find that POSCO was not forthcoming with its responses to

merit application of AFA.

POSCO argues that because it attempted to alert Commerce about its research and

development facility prior to verification, Commerce's statement that it "did not have an

opportunity to follow up on" the claim is misleading, and thus not supported by substantial

evidence.  See POSCO's Mot. 37–38.  As stated before, POSCO failed to provide information to

the Department in a timely manner.  The court finds POSCO's argument unavailing and

concludes that substantial evidence supports Commerce's application of AFA with respect to the

disclosure of information about the free economic zone program.

POSCO disputes Commerce's adverse inference that it benefited from the free economic

zone program.  POSCO claims that the Government of Korea's statement regarding the lack of

benefits conferred during the "investigation period" constitutes record evidence discrediting the

Department's finding that POSCO received a benefit from the location of its research and

development facility.  See id. at 37; see also Government of Korea's Response to Commerce's

Sept. 24, 2015 Initial Questionnaire at 68, PD 114, bar code 3413530-03 (Nov. 4, 2015).  This

argument amounts to an impermissible reweighing of the evidence.  See Downhole Pipe &

Equip., L.P. v. United States, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015) (citing Trent Tube Div.,

Crucible Materials Corp. v. Avesta Sandvik Tube AB, 975 F.2d 807, 815 (Fed. Cir. 1992)).  The

Department addressed this issue in its Final Issues and Decision Memorandum, noting that the

Government of Korea's response "does not clarify if the 'investigation period' it refers to is the

[period of investigation] or the entire 15-year" average useful life period of the subject

merchandise, and therefore the Department could not rely on the response to fill the gap in the

record.  See Final IDM at 69.  The Department found that POSCO could have benefited from the

program because "certain shareholders of POSCO do in fact appear to be foreign," and therefore

"POSCO could have been eligible to receive funding due to POSCO's Global [Research and

Development] Center's location in" a free economic zone.  See id. at 69–70 (citing POSCO and

Daewoo International Corporation's Response to the Affiliated Companies Questions of

Commerce's Sept. 24, 2015 Initial Questionnaire at Ex. 1, PD 74, bar code 3404843-01 (Oct. 12,

2015)).  The court concludes that Commerce's adverse inference that POSCO benefited from the

free economic zone program is supported by substantial evidence.

### D.  Commerce's Use of the Highest Calculated Rates in Korea for Programs That Could Have Conceivably Been Used by POSCO

POSCO disputes Commerce's selection of the highest calculated rates when applying

AFA.  POSCO contends that Commerce failed to evaluate the facts and circumstances that led to

the application of adverse inferences pursuant to 19 U.S.C. § 1677e(d)(2), and argues that

Commerce violated the statute by "defaulting" to the highest rate.  See POSCO's Mot. 22–24.

POSCO alleges that the record shows its attempts to comply, and therefore Commerce's

selection of the highest rates is not supported by substantial evidence.  See id. at 24–26.

Defendant rebuts that Commerce selected an appropriate rate according to its AFA hierarchy as

codified in 19 U.S.C. § 1677e(d).  See Def.'s Resp. 41–43.  Defendant argues that Commerce did

not "automatically" apply the highest rate because the Department explained how the discovery

of previously unreported information led to the application of AFA.  See id. at 44.  Defendant

and Petitioners assert that Commerce justified the selection of the highest rate adequately by

citing to the discovery of new information at verification.  See id.; Resp. Br. Def.-Intervenors

ArcelorMittal USA LLC, AK Steel Corporation, Nucor Corporation, Steel Dynamics, Inc., &

United States Steel Corporation 25–26, Sept. 27, 2017, ECF No. 66.

        19 U.S.C. § 1677e(d)(2) confers Commerce with discretion to apply the highest rate

when selecting among facts otherwise available and making an adverse inference.  The provision

reads, in relevant part:

> [T]he administering authority may apply any of the countervailable subsidy rates
> or dumping margins specified under [19 U.S.C. § 1677e(d)(1)], including the
> highest such rate or margin, *based on the evaluation by the administering authority*
> of the situation that resulted in the administering authority using an adverse
> inference in selecting among the facts otherwise available.

19 U.S.C. § 1677e(d)(2) (emphasis added).  The plain language of the statute allows Commerce

to select the highest rate, but only after Commerce examines the circumstances that led to the

application of AFA.  In other words, 19 U.S.C. § 1677e(d)(2) clearly requires Commerce to

conduct a fact-specific inquiry and to provide its reasons for selecting the highest rate out of all

potential countervailable subsidy rates in a particular case.  It is axiomatic that Commerce must

explain the basis for its decisions.  See, e.g., NMB Singapore Ltd. v. United States, 557 F.3d

1316, 1319–20 (Fed. Cir. 2009) ("[W]hile its explanations do not have to be perfect, the path of

Commerce's decision must be reasonably discernable to a reviewing court.").  Commerce did not

provide any such explanation in this investigation, and merely restated facts that contributed to

its decision to apply AFA.  See Final IDM at 11–12.  Commerce failed to connect the facts to its

selection of the highest rate specifically or to proffer additional facts to rationalize its choice.

See id.; see also POSCO, 42 CIT at __, 296 F. Supp. 3d at 1349 ("That the facts merited the use

of an adverse inference does not necessarily mean that those same facts merited selection of the

highest rate.").  For instance, the Final Issues and Decision Memorandum does not indicate how

Commerce employed its AFA hierarchy in this case, what range of rates Commerce considered

for this investigation, or why this particular investigation merited application of the highest rate.

Because Commerce failed to provide its reasoning for selecting the highest AFA rate, as required

by 19 U.S.C. § 1677e(d)(2), the court remands the final determination to Commerce.

POSCO argues that Commerce failed to corroborate the two selected rates in calculating

POSCO's total adverse facts available margin, rendering Commerce's final determination

unsupported by substantial evidence and not in accordance with the law.  See POSCO's Mot.

27–35.  Because the court remands the final determination for an explanation of Commerce's

application of the highest AFA rate, the court does not consider the issue at this juncture.

## II.    Nucor Corporation's Rule 56.2 Motion for Judgment on the Agency Record

The court addresses Nucor's Rule 56.2 motion for judgment on the agency record, which

contests various aspects of Commerce's determination regarding the Government of Korea's

provision of electricity to subject producers.  Electricity is one of the primary inputs used in the

production of hot-rolled steel.  The Government of Korea acts as a producer and distributor of

electricity in POSCO's home market and is responsible for setting the nation's electricity rates

through KEPCO, its state-owned and state-controlled electricity provider.  See Prelim. IDM at

29–30; see also Government of Korea's Response to Commerce's Sept. 24, 2015 Initial

Questionnaire at 4–6, PD 114, bar code 3413530-03 (Nov. 4, 2015).  Nucor requests that the

court remand this case to Commerce with instructions to "reconsider the reasonableness of a

third-country benchmark" and "address the arguments raised in Nucor's case brief demonstrating

that the [Government of Korea's] provision of electricity for [less than adequate remuneration] is

specific."  Nucor's Mot. 43.  For the following reasons, the court concludes that the

Department's findings with respect to the Government of Korea's provision of electricity to

subject producers are supported by substantial evidence and in accordance with the law.

### A.  Legal Standard

A countervailable subsidy exists when a foreign government or public entity provides a

financial contribution to a specific industry and a recipient within the industry receives a benefit

as a result of that contribution.  See 19 U.S.C. § 1677(5); see also Fine Furniture (Shanghai) Ltd.

v. United States, 748 F.3d at 1369.  A financial contribution includes, among other things,

providing goods or services, other than general infrastructure.  19 U.S.C. § 1677(5)(D)(iii).  The

statute defines "benefit" as "goods or services . . . provided for less than adequate remuneration,"

which are determined in "relation to prevailing market conditions for the good or service being

provided" in the country subject to the investigation or review.  Id. § 1677(5)(E)(iv).  Prevailing

market conditions include price, quality, availability, marketability, transportation, and other

conditions of purchase or sale.  Id. § 1677(5)(E).

Prior to the passage of the Uruguay Round Agreements Act, Pub. L. No. 103-465, § 101,

108 Stat. 4814 (codified as 19 U.S.C. § 3511 (1994)) ("URAA"), Commerce determined the

presence of a subsidy using the preferentiality standard, under which goods or services were

provided "at preferential rates."  See Maverick Tube Corp. v. United States, 41 CIT __, __, 273

F. Supp. 3d 1293, 1297 (2017), appeal docketed, No. 18-1351 (Fed. Cir. Dec. 28, 2017) (citing

19 U.S.C. § 1677(5)(A)(ii)(II) (1988)).  The URAA adopted the currently-used "adequate

remuneration" language.  Id.  Commerce codified its three-tiered, hierarchal approach for

determining the adequacy of remuneration of an investigated good or service.  See 19 C.F.R. §

351.511.  The "Tier One" benchmark analysis begins by identifying a proper benchmark price

and comparing the government price to a market-determined price for the good or service

resulting from actual transactions in the country in question.  Id. at § 351.511(a)(2)(i).  If no in-

country market price is available, Commerce compares the government price to a world market

price where it is reasonable to conclude that such price would be available to purchasers in the

country in question under the "Tier Two" benchmark analysis.  Id. at § 351.511(a)(2)(ii).  If no

world market price is available, Commerce will determine whether the government price is

consistent with market principles pursuant to a "Tier Three" benchmark analysis.  Id. at

§ 351.511(a)(2)(iii).  With respect to this Tier Three benchmark analysis, Commerce explained:

> Where the government is the sole provider of a good or service, and there are no
> world market prices available or accessible to the purchaser, we will assess whether
> the government price was set in accordance with market principles through an
> analysis of such factors as the government's price-setting philosophy, costs
> (including rates of return sufficient to ensure future operations), or possible price
> discrimination.  We are not putting these factors in any hierarchy, and we may rely
> on one or more of these factors in any particular case.  In our experience, these
> types of analyses may be necessary for such goods or services as electricity, land
> leases, or water, and the circumstances of each case vary widely.

Countervailing Duties, 63 Fed. Reg. 65,348, 65,378 (Dep't Commerce Nov. 25, 1998) (final

rule) ("CVD Preamble").  The rule then cites Pure Magnesium and Alloy Magnesium from

Canada, 57 Fed. Reg. 30,946 (Dep't Commerce July 13, 1992) ("Magnesium from Canada"),

which serves as an example of a useful Tier Three benchmark analysis for measuring the

adequacy of remuneration with respect to government-provided goods or services when the

government entity is the sole provider of the good or service.  Maverick Tube Corp., 40 CIT at

__, 273 F. Supp. 3d at 1299.  Under Magnesium from Canada, which involved the provision of

electricity, Commerce stated:

> The first step the Department takes in analyzing the potential preferential provision
> of electricity—assuming a finding of specificity—is to compare the price charged
> with the applicable rate on the power company's non-specific rate schedule . . . .  If
> the rate charged is consistent with the standard pricing mechanism and the company
> under investigation is, in all other respects, essentially treated no differently than
> other industries which purchase comparable amounts of electricity, we would
> probably not find a countervailable subsidy.

Magnesium from Canada, 57 Fed. Reg. at 30,949–50.

      In summary, Commerce conducts a countervailing subsidy analysis pursuant to the

statute, the regulation, and Commerce's past practice, as demonstrated by Magnesium from

Canada.  The Department first examines how the government-owned utility company sets its

rates and then determines whether a respondent receives a price that is better than that afforded

other companies or industries purchasing comparable amounts of electricity.  Maverick Tube

Corp., 41 CIT at __, 273 F. Supp. 3d at 1300.

**B.  Commerce's Determination That the Government of Korea's Provision of
     Electricity for Less Than Adequate Remuneration Did Not Confer a Benefit
     to Subject Producers**

      Commerce found in the underlying investigation that a Tier One benchmark (market

prices from actual transactions within the country under investigation) was not available because

KEPCO was the predominant provider of electricity in the Korean market.  See Prelim. IDM at

30.  Commerce found that a Tier Two benchmark (world market prices) was also not available

because there was no cross-border transmission or distribution of electricity into Korea.  See id.

at 30–31.  Commerce turned to a Tier Three benchmark analysis to assess whether the

government price was set in accordance with market principles.  See Final IDM at 38–50.

    Nucor contends first that Commerce's reliance on the standard pricing mechanism is

contrary to the statute and Congressional intent because the URAA eliminated the preferentiality

standard.  See Nucor's Mot. 15–16.  The Court has recently upheld Commerce's analysis in

similar situations.  See POSCO, 42 CIT at __, 296 F. Supp. 3d. at 1355–56; Nucor Corp. v.

United States, 42 CIT __, __, 286 F. Supp. 3d 1364, 1373–74 (2018), appeal docketed, No. 18-

1787 (Fed. Cir. Apr. 6, 2018); Maverick Tube Corp., 41 CIT at __, 273 F. Supp. 3d at 1303–04.

The Department's application here is consistent with the statutory requirement that the adequacy

of remuneration be determined in relation to prevailing market conditions, as set forth under 19

U.S.C. § 1677(5)(E).  Nucor's argument fails to consider the legislative history of the regulation,

which incorporates factors such as the government's price-setting philosophy, i.e., the standard

pricing mechanism, into 19 C.F.R. § 351.511 as part of Commerce's Tier Three benchmark

analysis.  See CVD Preamble, 63 Fed. Reg. at 65,378; see also Nucor Corp., 42 CIT at __, 286 F.

Supp. 3d at 1374.  By including this factor as part of its Tier Three benchmark analysis,

Commerce preserved the preferentiality-based test.  See Nucor Corp, 42 CIT at __, 286 F. Supp.

3d at 1374; see also Countervailing Duties, 62 Fed. Reg. 8,818, 8,836 (Dep't Commerce Feb. 26,

1997) (notice of proposed rulemaking and request for public comments) ("There is no indication

that Congress intended to change our practice with respect to government-provided goods and

services such as electricity . . . .").  Commerce applied KEPCO's standard pricing mechanism to

determine that KEPCO's prices are set in accordance with market principles.

Contrary to Nucor's arguments, Commerce did not rely improperly on <u>Magnesium from</u> <u>Canada</u>'s standard pricing mechanism to measure preferentiality in contravention of the revised statutory language of "less than adequate remuneration."  In <u>Magnesium from Canada</u>, Commerce compared two different government prices: the price that the government normally charged and the contract price that the government charged the respondent.  <u>See</u> <u>Magnesium</u> <u>from Canada</u>, 57 Fed. Reg. at 30,949–50.  In this investigation, Commerce utilized <u>Magnesium</u> <u>from Canada</u>'s standard pricing mechanism as one factor in its Tier Three benchmark analysis. The fact that <u>Magnesium from Canada</u> was guided by the pre-URAA "preferentiality" standard does not mean its standard pricing mechanism analysis cannot be used to determine the adequacy of the remuneration under a Tier Three benchmark analysis.  <u>See</u> <u>Maverick Tube Corp.</u>, 41 CIT at __, 273 F. Supp. 3d at 1307 (stating the relevancy of <u>Magnesium from Canada</u>'s standard pricing mechanism in determining the adequacy of remuneration when market-based prices are unavailable).  In fact, Commerce's past experience shows that in certain situations, preferentiality-based tests may be useful when determining the adequacy of remuneration.  <u>See</u> <u>id.</u> (citing <u>Steel Wire Rod From Germany</u>, 62 Fed. Reg. 54,990, 54,994 (Dep't Commerce Oct. 22, 1997) (final affirmative countervailing duty determination)).  In a monopolistic situation, such as situations involving the state-controlled provision of electricity, analyzing whether electricity rates are based on a standard pricing mechanism and then examining if a company or industry obtains a preferential rate is a reasonable way to determine whether a state-controlled supplier receives adequate remuneration.  <u>See</u> <u>id.</u>

Nucor asserts that Commerce's interpretation of "adequate remuneration" is contrary to the plain meaning of the statute.  Nucor contends that adequate remuneration must mean, by

common definition, that the seller is able to cover its costs of providing a good.  See Nucor's

Mot. 21–22.  By focusing exclusively on a price-setting philosophy, Nucor urges that Commerce

arbitrarily and capriciously ignored record evidence on cost.  See id. at 23.  Nucor's argument

lacks merit.  The Preamble to 19 C.F.R. § 351.511 provides that "Commerce may look solely at a

government's price-setting philosophy (i.e., its standard pricing mechanism) under a [T]ier

[T]hree benchmark analysis."  Maverick Tube Corp., 41 CIT at __, 273 F. Supp. 3d at 1309.  It

was not inappropriate for Commerce to consider heavily the Government of Korea's price-

setting philosophy in the underlying investigation.  The record shows that Commerce did not

ignore evidence on cost in making its final determination.  See Final IDM at 49.  The

Department stated:

> [W]ith regard to the "[T]ier [T]hree" benchmark used to determine whether the
> provision of electricity was for adequate remuneration, KEPCO's standard pricing
> mechanism used to develop its tariff schedule was based upon its costs.  To develop
> the electricity tariff schedules that were applicable during the [period of
> investigation], KEPCO first calculated its overall cost, including an amount for
> investment return.  This cost includes the operational cost for generating and
> supplying electricity to the consumers as well as taxes.  The cost for each electricity
> classification was calculated by (1) distributing the overall cost according to the
> stages of providing electricity (generation, transmission, distribution, and sales);
> (2) dividing each cost into fixed cost, variable cost, and the consumer management
> fee; and (3) then calculating the cost by applying the electricity load level, peak
> level, and the patterns of consuming electricity.  Each cost was then distributed into
> the fixed charge and the variable charge.  KEPCO then divided each cost taking
> into consideration the electricity load level, the usage pattern of electricity, and the
> volume of the electricity consumed.  Costs were then distributed according to the
> number of consumers for each classification of electricity.  For the [period of
> investigation], KEPCO more than fully covered its cost for the industry tariff
> applicable to our respondents.

Id. (footnotes omitted).  The court concludes that Commerce did not act arbitrarily and

capriciously in finding that the Government of Korea's provision of electricity to subject

producers for less than adequate remuneration did not confer a benefit, and upholds this

determination as in accordance with the law.

### C.  Commerce's Decision to Not Consider the Korea Power Exchange

Nucor contends that Commerce failed to address arguments regarding how the KPX

potentially distorts costs, and therefore the Department's determination regarding whether

Korean electricity prices are set in accordance with market principles is not supported by record

evidence.  See Nucor's Mot. 23–30.  Nucor's argument lacks merit.  Commerce found that a

single tariff rate table applied to respondents during the entire period of investigation.  See Final

IDM at 45.  The Department also stated:

> [W]ith respect to the costs of the generators, including the nuclear generators, the
> Department did not request these costs because the costs of electricity to KEPCO
> are determined by the KPX.  Electricity generators sell electricity to the KPX, and
> KEPCO purchases the electricity it distributes to its customers through the KPX.
> Thus, the costs for electricity are based upon the purchase price of electricity from
> the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule.

Id. at 49 (footnote omitted).  Despite Nucor's attempts to advocate for a contrary finding in the

underlying proceedings, Commerce determined that Nucor failed to provide evidence and to

support its claims adequately.  See id.  The court declines to reweigh the evidence here.  See

Downhole Pipe & Equip., L.P., 776 F.3d at 1377 (quoting Trent Tube Div., Crucible Materials

Corp., 975 F.2d at 815).  "Nothing in the statute requires Commerce to consider how the

authority acquired the good or service that was later provided to respondents."  Nucor Corp., 42

CIT at __, 286 F. Supp. 3d at 1376.  The court concludes that Commerce's decision to disregard

the KPX in its determination of whether Korean electricity prices are consistent with market

principles is supported by substantial evidence.

### D. Commerce's Determination That Korean Electricity Prices Are Consistent With Market Principles

Nucor contends that Commerce's finding that Korean electricity prices are consistent with market principles was not supported by substantial evidence.  See Nucor's Mot. 30–36.  The court disagrees.  Commerce found, under its Tier Three benchmark analysis, that KEPCO used a standard pricing mechanism that covered its costs and that the rate applied to respondents constituted adequate remuneration because respondents were treated no differently from other industrial users purchasing comparable amounts of electricity.  See Final IDM at 45.  Commerce analyzed KEPCO's price-setting method and found that prices charged by KEPCO are set in accordance with market principles.  See id. at 44.  Commerce determined that KEPCO's provision of electricity conferred no benefit to POSCO and Hyundai Steel in line with prevailing market conditions and consistent with KEPCO's standard pricing mechanism.  See id. at 45.  The Department conducted a proper Tier Three benchmark analysis pursuant to 19 C.F.R. § 351.511(a)(2)(iii) and supported its findings with record evidence.  The court concludes that Commerce's determination that the Korean electricity prices are consistent with market principles is supported by substantial evidence.

### E. Commerce's Refusal to Apply Adverse Facts Available to the Government of Korea

Nucor argues that the Government of Korea failed repeatedly "to provide complete, accurate, and verifiable information on KEPCO's price-setting procedures and electricity generation costs in this investigation," and therefore the Department should have applied AFA. Nucor's Mot. 36.  Nucor contends that Commerce's failure to apply AFA "is unsupported by substantial evidence, arbitrary, and an abuse of discretion."  Id.

19 U.S.C. § 1677e grants the Department discretion to decide whether to apply AFA in each case.  See 19 U.S.C. § 1677e(b).  Commerce determined in this investigation that the Government of Korea responded to inquiries in a timely and complete manner.  See Final IDM at 38–39.  The Department found that the Government of Korea "did not withhold information that was requested of it, did not fail to meet deadlines, did not significantly impede the proceeding, and did not provide unverifiable information."  Id.  Because the Government of Korea cooperated to the best of its ability, Commerce determined that the application of AFA with respect to the alleged provision of electricity for less than adequate remuneration was unwarranted.  Id.  The court concludes that substantial evidence supports the Department's decision to not apply AFA to the Government of Korea.

## CONCLUSION

For the foregoing reasons, the court concludes that:

1. Commerce's application of AFA against POSCO with respect to POSCO's four cross-owned affiliates was proper;

2. Commerce's rejection of factual information submitted at verification regarding POSCO's affiliated trading company, Daewoo, is moot;

3. Commerce's application of AFA against POSCO with respect to POSCO's facility located in a free economic zone was proper;

4. Commerce's selection of the highest rates when applying AFA, without articulating its reasoning, was improper;

5. Commerce's determination that the Government of Korea's provision of electricity to respondents was not for less than adequate remuneration was proper;

6.   Commerce's decision to not take into account information regarding the Korea Power
     Exchange was proper;

7.   Commerce's determination that the Government of Korea's provision of electricity is
     consistent with market principles was proper; and

8.   Commerce's decision to not apply AFA against the Government of Korea was proper.

POSCO's Rule 56.2 motion for judgment on the agency record is granted in part and

denied in part.  Commerce's final determination is remanded with instructions to select and

properly justify the AFA rates applied to POSCO consistent with this opinion.  The issue of

corroboration will be addressed after remand proceedings.  Nucor's Rule 56.2 motion for

judgment on the agency record is denied.

Accordingly, it is hereby

**ORDERED** that Commerce's decision to apply adverse facts available is sustained with

respect to the failure to report POSCO's cross-owned affiliates, Daewoo's loans, and POSCO's

facility located in a free economic zone; and it is further

**ORDERED** that Commerce's Final Determination is remanded to Commerce with

respect to Commerce's selection of the highest calculated rates for POSCO; and it is further

**ORDERED** that Commerce's findings regarding the Government of Korea's provision

of electricity are sustained; and it is further

**ORDERED** that the following schedule shall govern the remand proceedings:

1.   Commerce shall file its remand redetermination on or before November 13, 2018;

2.   Commerce shall file the administrative record on remand on or before November 27,
     2018;

3.   The Parties shall file any comments on the remand redetermination on or before

     December 13, 2018;

4.   The Parties shall file any replies to the comments on or before January 14, 2019; and

5.   The joint appendix shall be filed on or before January 22, 2019.


                                               /s/ Jennifer Choe-Groves
                                              Jennifer Choe-Groves, Judge

Dated:  September 11, 2018
        New York, New York