**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

| | |
|---|---|
| POSCO, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | )   Consol. Court No. 16-00227 |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| STEEL DYNAMICS, INC., *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

**DEFENDANT'S RESPONSE TO COMMENTS
ON SECOND REMAND REDETERMINATION**

<table>
<tr><td></td><td>BRIAN M. BOYNTON<br>Acting Assistant Attorney General</td></tr>
<tr><td></td><td>JEANNE E. DAVIDSON<br>Director</td></tr>
<tr><td>OF COUNSEL:<br>HENDRICKS VALENZUELA<br>Attorney<br>U.S. Department of Commerce<br>Office of the Chief Counsel<br>  for Trade Enforcement & Compliance<br>Washington, D.C.</td><td>PATRICIA M. MCCARTHY<br>Assistant Director<br>U.S. Department of Justice<br>Commercial Litigation Branch<br>P.O. Box 480, Ben Franklin Station<br>Washington, DC 20044<br>Tel: (202) 307-0164<br>Patricia.mccarthy@usdoj.gov</td></tr>
<tr><td>August 18, 2021</td><td>Attorneys for Defendant United States</td></tr>
</table>

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

BACKGROUND ................................................................................................................. 2

ARGUMENT ..................................................................................................................... 3

I.    Standard Of Review ..................................................................................... 3

II.    The Second Remand Redetermination Complies With The Federal Circuit's Mandate, Is Supported By Substantial Evidence, And Is Otherwise In Accordance With Law .......................................................................... 4

        A.    Commerce's Less-Than-Adequate Remuneration Analysis Is Based On A Determination Of Whether KEPCO Recovered Cost Of Production Plus A Return On Investment And Is In Accordance With The Statute ............................................................................... 5

        B.    Commerce Appropriately Accounted For KPX's Role In The Electricity Market In Korea And Accounted For The Cost Of Generating Electricity In Its Less-Than-Adequate Remuneration Analysis ........................................................................................................ 9

CONCLUSION ............................................................................................................... 13

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ............................................................................ 3

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1996) ............................................................................ 4

*I.N.S. v. Elias-Zacarias*,
   502 U.S. 478 (1992) ............................................................................ 4

*MacLean-Fogg Co. v. United States*,
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................ 3

*POSCO v. United States*,
   977 F.3d 1369 (Fed. Cir. 2020) .................................................... 1, 2, 4

*POSCO v. United States,*
   337 F. Supp. 2d 1265 (Ct. Int'l Trade 2018) (*POSCO I*) .................. 2, 3

*U.S. Steel Corp. v. United States*,
   33 CIT 1935 (Ct. Int'l Trade 2009) .................................................. 11, 12

**STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................ 3

19 U.S.C. § 1677(5)(E)(iv) ..................................................................... 4

**REGULATIONS**

19 C.F.R. §§ 351.511(a)(2)(i) and (a)(2)(ii) ........................................ 11

19 C.F.R. § 351.511(a)(2)(iii) .......................................................... 10, 11

**ADMINISTRATIVE DETERMINATIONS**

*Pure Magnesium and Alloy Magnesium from Canada*,
   57 Fed. Reg. 30,946 (Dep't of Commerce July 13, 1992) .................. 7, 8

*Countervailing Duties,*
   63 Fed. Reg. 65,348, 65,377-65,378 (Dep't of Commerce Nov. 25, 1998) ............................ 12

*Circular Welded Carbon Quality Steel Pipe and Tube from the People's Republic of China*,
   73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008) ...................... 11

*Light-Walled Rectangular Pipe and Tube from the People's Republic of China,*
 73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008) ........................................................ 11

*Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the
Republic of Korea,*
 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) ........................................................ 2

*Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea,*
 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) ........................................................ 2

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE JENNIFER CHOE-GROVES, JUDGE

_____

|  |  |  |
|---|---|---|
| POSCO, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | Consol. Court No. 16-00227 |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STEEL DYNAMICS, INC., *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____

## DEFENDANT'S RESPONSE TO COMMENTS
## ON SECOND REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to comments filed by defendant-intervenor Nucor Corporation (Nucor) on July 19, 2021, ECF No. 127 (Nucor Comments), regarding the Department of Commerce's (Commerce) second remand redetermination, Final Results of Redetermination Pursuant to Court Remand Order, dated June 9, 2021, ECF No. 125 (Second Remand Redetermination), Second Remand P.R. 3.  Following this Court's remand order of March 8, 2021, Commerce issued its second remand redetermination after conducting further proceedings consistent with the opinion of the Court of Appeals for the Federal Circuit in *POSCO v. United States*, 977 F.3d 1369 (Fed. Cir. 2020) (*POSCO II*).  As we demonstrate below, the Court should sustain the second remand redetermination and enter final judgment in favor of the United States because Commerce has fully complied with this Court's remand order and the Federal Circuit's mandate, and because

1

the second remand redetermination is supported by substantial evidence and otherwise in accordance with law.

## BACKGROUND

In 2016, Commerce issued final and amended final determinations in the countervailing duty investigation of certain hot-rolled steel flat products from the Republic of Korea. *Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea*, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) (final determination), *amended by Certain Hot-Rolled Steel Flat Products from Brazil and the Republic of Korea*, 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3, 2016) (amend. final and order), P.R. 456.  For the provision of electricity for less-than-adequate remuneration program in the final determination, Commerce addressed parties' comments, relied on its preliminary findings, and continued to determine that the program did not confer a benefit and was not countervailable.

The Court sustained Commerce's final determination, holding that Commerce's determinations challenged by Nucor with regard to the provision of electricity for less-than-adequate remuneration were supported by substantial evidence and otherwise in accordance with law.  *See POSCO v. United States,* 337 F. Supp. 2d 1265 (Ct. Int'l Trade 2018) (*POSCO I*).

On appeal, in a related case, Court No. 16-00225 concerning cold-rolled steel flat products from Korea, the Federal Circuit, addressing the same issue challenged in this proceeding, held that Commerce's benefit analysis and its failure to investigate the role of the Korean Power Exchange (KPX), a wholly-owned subsidiary of the Korean Electric Power Corporation (KEPCO) that purchases electricity from generators in Korea and then sells the electricity to KEPCO in the Korean electricity market, were contrary to law.  *POSCO II*, 977 F.3d at 1376.  Following *POSCO II*, Nucor moved unopposed to vacate this Court's decision in

*POSCO I* which sustained Commerce's final determination.  On March 4, 2021, the Federal Circuit granted Nucor's motion and vacated this Court's decision in *POSCO I*.  Mandate dated Mar. 4, 2021 (ECF No. 123).  This Court then remanded the determination to Commerce, directing it to address the Federal Circuit's opinion in *POSCO II*.  Remand Order dated Mar. 8, 2021 (ECF No. 124).

Commerce issued its draft second remand redetermination on March 23, 2021 and continued to find that the Government of Korea's (GOK) provision of electricity to the respondents was not for less-than-adequate remuneration and thus conferred no benefit.  Second Remand P.R. 1.  Nucor submitted comments on the draft second remand redetermination to Commerce, arguing that Commerce had failed to address the holdings in *POSCO II* and that the draft remand redetermination was not in accordance with law.  Still, in the second remand redetermination filed with the Court on June 10, 2021, Commerce determined that the GOK's provision of electricity was not for less-than-adequate remuneration and thus did not confer a benefit.  *See* Second Remand Redetermination.

**ARGUMENT**

**I.    Standard Of Review**

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence, and the possibility of drawing two inconsistent

3

conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1996). Instead, when, as here, Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

## II.     The Second Remand Redetermination Complies With The Federal Circuit's Mandate, Is Supported By Substantial Evidence, And Is Otherwise In Accordance With Law

In vacating and remanding Commerce's analysis as to whether KEPCO had provided electricity to the respondents for less-than-adequate remuneration during the period of investigation, the Federal Circuit held that Commerce had relied impermissibly on a preferential price analysis rather than the statutorily mandated analysis set forth in 19 U.S.C. § 1677(5)(E)(iv). Although the Federal Circuit acknowledged that Commerce had considered KEPCO's overall cost, including its operational cost for generating and supplying electricity, in conducting its analysis, it nonetheless held that Commerce's analysis ultimately relied on whether respondents had received preferential treatment. *POSCO II*, 977 F.3d at 1376. The Federal Circuit further held that Commerce had failed to account for KPX's role in the electricity market as a part of its less-than-adequate remuneration analysis. *Id.* In the second remand redetermination, Commerce thoroughly explained its benefit analysis on remand and clarified how its less-than-adequate remuneration analysis is a multifaceted analysis of "fair-market principles" used to determine whether KEPCO had charged a tariff rate to the respondent that covers "cost of production" plus "a profitable return on the investment." Second Remand Redetermination at 11-16, 29-33. Commerce also cited additional evidence regarding KPX's

4

role in the electricity market and the cost of generating electricity, as a means of demonstrating

that it had properly accounted for KPX's role in the electricity market in its analysis. *Id.* at 6-8,

38-42. By providing further explanation of how its second remand redetermination is based on

an analysis of fair-market principles, rather than a preferentiality standard, and explaining KPX's

role in the electricity market, Commerce complied with the Federal Circuit's mandate and this

Court's remand order.

### A. Commerce's Less-Than-Adequate Remuneration Analysis Is Based On A Determination Of Whether KEPCO Recovered Cost Of Production Plus A Return On Investment And Is In Accordance With The Statute

Nucor argues in its remand comments that Commerce did not apply the "cost plus a

return on investment" standard in either the final determination or in the second remand

redetermination. Nucor Comments at 4-9. Nucor ignores the thorough explanation in the second

remand redetermination that details how Commerce performed its less-than-adequate

remuneration analysis regarding electricity in Korea. First, in determining whether electricity

has been provided for less-than-adequate remuneration, Commerce examined whether the tariff

rate charged to the respondent covers "cost of production" plus a "profitable return on the

investment." Second Remand Redetermination at 12, 30. Commerce next examined whether the

respondents were charged the appropriate tariff rate based on the prevailing market conditions

within Korea. *Id.* at 12, 31.

As Commerce explained in the second remand redetermination, KEPCO's standard

pricing mechanism, which serves as the basis for its tariff schedule and classifications, was based

on KEPCO's costs. *Id.* at 13 (citing IDM at 49). KEPCO calculated the cost for each electricity

tariff classification by: (1) distributing the overall cost according to the stages of providing

electricity (generation, transmission, distribution, and sales); (2) dividing each cost into fixed

cost, variable cost, and the consumer management fee; and (3) then calculating the cost by applying the electricity load level, peak level, and the patterns of consuming electricity. *Id.* After distributing each cost into the fixed charge and the variable charge, KEPCO divided each cost, taking into consideration the electricity load level, the usage pattern of electricity, and the volume of electricity consumed. *Id.* Costs were then further distributed according to the number of consumers for each classification of electricity. *Id.* For the period of investigation, Commerce concluded that KEPCO more than fully covered its cost for the industrial tariff rate applicable to the respondents. *Id.* at 13-14.

Commerce, in analyzing the price charged for electricity by KEPCO to the respondents, determined whether the price charged was consistent with market principles and prevailing market conditions in Korea by first analyzing KEPCO's tariff classifications. *Id.* at 14. Tariff classifications, including the ones established by KEPCO, which are delineated by electricity contract demand, voltage, usage pattern of electricity, and volume of electricity, are established in a manner that considers typical prevailing market conditions such as "price, quality, availability, marketability, transportation, and other conditions of purchase or sale" as described in the statute within § 1677(5)(E). *Id.* at 15. Because KEPCO had considered prevailing market conditions such as those described in § 1677(5)(E) in establishing its tariff classifications, Commerce determined that KEPCO had developed a tariff schedule that adequately enabled recovery of costs, in addition to obtaining a profitable return on investment. *Id.* Thus, Commerce did not treat KEPCO's tariff classifications as "coextensive with" the prevailing market conditions in Korea, as Nucor claims. *See* Nucor Comments at 11-13. Instead, Commerce determined that KEPCO's tariff classifications were developed *in accordance with* market principles as described in § 1677(5)(E). *See* Second Remand Redetermination at 14-15.

Once Commerce determined that KEPCO had established its tariff classification schedule in accordance with market principles, it further determined under § 1677(5)(E) whether the respondent was actually charged the appropriate tariff rate in accordance with the criteria set forth in the tariff classifications.  *Id.*  KEPCO, in determining electricity prices for purchasing companies, differentiated by both contract demand for electricity and by the voltage of electricity distributed, and the costs used for each tariff classification further considered the electricity load level, the usage pattern of electricity, and the volume of energy consumed.  *Id.*  In reviewing the record evidence, Commerce found that the rates charged to respondent companies were in accordance with the relevant tariff classifications for each respondent company as established by KEPCO, and thus ensured that KEPCO had actually recovered its costs plus a return on investment during the period of investigation.  *Id.*  Because KEPCO had established a tariff schedule based on a variety of relevant market conditions for purposes of recovering cost plus a return on investment, and further charged respondent steel companies under the appropriate tariff classification to ensure cost recovery plus a return, Commerce found that KEPCO had recovered its cost plus a profitable return on investment, and therefore no benefit had been conferred in the form of electricity for less-than-adequate remuneration.  *Id.* at 15-17.

In arguing that Commerce had actually used a preferentiality standard, Nucor relies heavily on *Pure Magnesium and Alloy Magnesium from Canada*, 57 Fed. Reg. 30,946 (Dep't of Commerce July 13, 1992) (*Magnesium from Canada*), and mischaracterizes Commerce's analysis in the second remand redetermination.  *See* Nucor Comments at 6-8.  Nucor takes separate and distinct sentences out of context and attempts to use them to show that Commerce had somehow relied on a preferentiality standard.  *See, e.g.,* Nucor Comments at 6.

As explained at length, Commerce cited *Magnesium from Canada* because that is the first case in which Commerce had developed an adequacy of remuneration analysis as an alternative to preferentiality.  *See* Second Remand Redetermination at 26-27.  That historical case is not the basis for Commerce's contemporaneous remand determination at issue here, nor did Commerce rely on any preferentiality standard, such as that found in *Magnesium from Canada*, in determining that KEPCO had provided no benefit to respondent companies in the form of the provision of electricity for less-than-adequate remuneration.  *See* Second Remand Redetermination at 9-16, 26-27, 29-35.  Moreover, although Commerce cited *Magnesium from Canada*, the underlying determination at issue here was ultimately based on an analysis under § 1677(5)(E) and a finding that KEPCO had recovered costs of production plus a profitable return on investment  *Id.* at 11-16.  In carrying out this analysis, Commerce did not rely on a simple price-to-price comparison to determine whether respondent companies had received preferential treatment, which is what Commerce would have done had it used a preferentiality standard, but rather Commerce determined whether KEPCO had established tariff classifications in accordance with market principles and had actually charged prices that enabled both recovery of costs and a profitable return on investment.  *Id.*

Thus, in further explaining its less-than-adequate remuneration analysis and how it is based on whether KEPCO had recovered the "cost of production" plus a "return on investment" in accordance with fair-market principles, Commerce complied with the Federal Circuit's mandate in *POSCO II* and did *not* rely on a preferentiality standard in determining whether KEPCO had provided electricity for less-than-adequate remuneration during the period of investigation.

**B. Commerce Appropriately Accounted For KPX's Role In The Electricity Market In Korea And Accounted For The Cost Of Generating Electricity In Its Less-Than-Adequate Remuneration Analysis**

As Commerce explained, publicly available record evidence demonstrates that the KPX unit price more than covered fuel costs for each of the generators, and further demonstrates that KPX not only recovered costs, but also received a return on investment during the period of investigation. *See* Second Remand Redetermination at 38-39. First, the listed prices for each of KEPCO's generation subsidiaries can be found in KEPCO's Form 20-F and demonstrate that the unit price charged by KPX more than covered the cost of generating electricity for each of the generators in question during the period of investigation. *See id.* (citing "Response of the Government of Korea to Section II of the Department's September 24, 2015 Questionnaire" at Exhibit E-3, P.R. 119). This same Form 20-F further shows not only that KEPCO itself was profitable, but also that KPX's prices had enabled KEPCO's generation subsidiaries to recover costs and receive a return on investment. *Id.* Given that KPX's unit prices more than covered fuel costs, and KEPCO's generation subsidiaries both recovered their own costs and received a return on investment, Nucor cannot cite record evidence to support its argument that Commerce had failed to account for the cost of generating electricity in its less-than-adequate remuneration analysis, or that any benefit resulted from KPX's pricing of electricity sold to KEPCO. *Id.*

Nucor's argument that this analysis is based solely on KEPCO's overall profitability oversimplifies the second remand redetermination and fails to evaluate this evidence in the context of the full benefit analysis discussed above. Nucor Comments at 15-17. As previously explained, Commerce based its analysis on a determination of whether KEPCO had established a tariff classification schedule based on market principles and had charged respondent companies a price that enabled KEPCO not only to recover costs, but also to receive a return on investment.

*See* Second Remand Redetermination at 11-16.  By citing the GOK's Form 20-F, Commerce included a step-by-step analysis of profitability from the generators to KPX, from KPX to KEPCO, and from KEPCO to the respondent companies who purchased the electricity.  *See id.* at 38-39.  If record evidence demonstrates that KPX purchased electricity from generators at prices sufficient to ensure recovery of costs plus a return on investment for the generators; sold the electricity to KEPCO at prices sufficient to ensure recovery of costs plus a return on investment for KPX; and if KEPCO established a tariff classification schedule that ensured recovery of costs plus a return on investment for KEPCO; and charged respondent companies a price that actually resulted in KEPCO recovering costs plus a return on investment, then the record evidence demonstrates that KEPCO's prices to the respondents reflected adequate remuneration.  *Id.*

This is not, as Nucor argues, evidence solely related to KEPCO in the aggregate being profitable on all sales to all users, but rather evidence demonstrating that the electricity market, at each step in the chain of electricity distribution, operated based on prices that ensured a recovery of costs plus a return on investment consistent with 19 C.F.R. § 351.511(a)(2)(iii).  Because the Form 20-F shows this step-by-step exchange of electricity and both KEPCO's and KPX's profitability during the period of investigation, there is substantial record evidence supporting Commerce's finding that the cost of generating electricity was accounted for and did not ultimately result in a benefit to respondent companies in the form of the provision of electricity for less-than-adequate remuneration.  *Id.*  This record evidence supports Commerce's finding that no benefit resulted from KPX's pricing of electricity, and thus there was no need for Commerce to request any of the additional information Nucor argues should have been included in Commerce's supplemental questionnaires. *See, e.g.,* Nucor Comments. at 12-13.

10

Further, the administrative determinations on which Nucor relies in its remand comments, as well as *U.S. Steel Corp. v. United States*, 33 CIT 1935 (Ct. Int'l Trade 2009), deal only with the selection of benchmarks in either a tier-one or tier two analysis under 19 C.F.R. §§ 351.511(a)(2)(i) and (a)(2)(ii), respectively, and not a tier-three benchmark under 19 C.F.R. § 351.511(a)(2)(iii), which, as noted above, Commerce relied on in the second remand redetermination.  In *LWRP from China* and *Circular Welded Pipe from China*, the respondents requested a tier-three analysis for hot-rolled steel (HRS) producers.  *See Light-Walled Rectangular Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 35,642 (Dep't of Commerce June 24, 2008) (*LWRP from China*), and accompanying IDM at 33; *Circular Welded Carbon Quality Steel Pipe and Tube from the People's Republic of China*, 73 Fed. Reg. 31,966 (Dep't of Commerce June 5, 2008) (*Circular Welded Pipe from China*), and accompanying IDM at 64-66.  But in *LWRP from China*, Commerce only determined that HRS producers' profitability was not relevant in the context of the tier-one analysis and subsequently used a tier-two benchmark.  *LWRP from China* IDM at 36-37.  In *Circular Welded Pipe from China*, Commerce was able to use world market-determined price as a surrogate for actual import prices, under a tier-one analysis.  *Circular Welded Pipe from China* IDM at 65-66 ("These prices are thus appropriately considered tier one benchmark prices").  In each of these cases, Commerce discussed the producers' profitability within the context of a tier-one benchmark related to actual import prices.  *See LWRP from China* IDM at 36-37; *Circular Welded Pipe from China* IDM at 64-66.

Thus, Commerce had no occasion to address the issue of market principles under tier three in those cases because it was able to rely on either a tier-two world market price or tier-one import prices for HRS, an input that is globally traded and does not have the limitations of the

Korean electricity market that may necessitate a tier-three analysis.  *See Countervailing Duties,* 63 Fed. Reg. 65,348, 65,377-65,378 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).  This is also true for *U.S. Steel Corp. v. United States*, in which this Court addressed Commerce's reliance on actual transaction prices under a tier-one analysis, rather than an assessment of government prices in accordance with market principles under a tier-three analysis.  *See* 33 C.I.T. at 1943-45.  Neither the administrative determinations nor the Court's precedent cited by Nucor are relevant to the type of benchmark analysis that Commerce performed in the second remand redetermination, nor do they show Commerce somehow erred in carrying out its analysis under a tier-three analysis to determine whether government prices were consistent with market principles.

Finally, Nucor argues that Commerce's reference to upstream subsidy findings in subsequent administrative reviews is irrelevant to the question of whether Commerce properly analyzed KPX's role in investigating whether KEPCO's prices conferred a benefit to the respondents.  *See* Nucor Comments at 14-15.  As Commerce explained in the second remand redetermination, "{w}hile the *2017 Administrative Review of Hot-Rolled Steel* did involve the investigation of an alleged upstream subsidy, Commerce did not cite that determination because it involved the investigation of an upstream subsidy."  Second Remand Redetermination at 41. Instead, Commerce referenced this subsequent review of the same countervailing duty order because Commerce "investigated and verified the pricing structure between KPX and KEPCO" including KPX's methodology used to forecast demand, KPX's methodology to set the system marginal price, the electricity generator's reporting requirements to establish variable and fixed costs, and the underlying methodology to determine the electricity generator's rates of return and the adjusted coefficient.  *See id.* at 42 n.149.

This investigation, and verification performed in an administrative review following the underlying investigation at issue here, are both relevant to the Federal Circuit's instructions that Commerce include KPX's generation costs in its analysis and further confirm the information on the record demonstrating that there was no measurable benefit related to KPX's pricing of electricity to KEPCO during the period of investigation. *See id.*

As such, Commerce complied with the Federal Circuit's mandate and this Court's remand order by explaining, in the second remand redetermination, how KPX's role in the electricity market and the cost of generating electricity did not result in a conferred benefit to respondent companies during the period of investigation.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's second remand redetermination and enter final judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

OF COUNSEL:                          s/Patricia M. McCarthy
HENDRICKS VALENZUELA                 PATRICIA M. MCCARTHY
Attorney                             Assistant Director
U.S. Department of Commerce          U.S. Department of Justice
Office of the Chief Counsel          Commercial Litigation Branch
  for Trade Enforcement & Compliance P.O. Box 480, Ben Franklin Station
Washington, D.C.                     Washington, DC 20044
                                     Tel: (202) 307-0164
                                     Patricia.mccarthy@usdoj.gov

August 18, 2021                      Attorneys for Defendant United States

13

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief complies with the appropriate word-count limitation. According to the word-count function of the software used to prepare this brief, the brief contains 3,705 words.


<u>s/ Patricia M. McCarthy</u>
Patricia M. McCarthy