Slip Op. 22-65

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **POSCO,** | |
|     **Plaintiff,** | |
| **and** | |
| **NUCOR CORPORATION,** | |
|     **Consolidated Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before:  Jennifer Choe-Groves, Judge** |
|     **Defendant,** | **Consol. Court No. 16-00227** |
| **and** | |
| **STEEL DYNAMICS, INC., AK STEEL CORPORATION, ARCELORMITTAL USA LLC, NUCOR CORPORATION, UNITED STATES STEEL CORPORATION, POSCO, HYUNDAI STEEL COMPANY, and GOVERNMENT OF KOREA,** | |
|     **Defendant-Intervenors.** | |

## OPINION

[Sustaining the U.S. Department of Commerce's second remand determination following a countervailing duty investigation of certain hot-rolled steel flat products from the Republic of Korea.]

Dated:  June 13, 2022

Donald B. Cameron, Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, and Eugene Degnan, Morris, Manning & Martin LLP, of Washington, D.C., for Plaintiff and Defendant-Intervenor POSCO and Defendant-Intervenors Hyundai Steel Company and the Government of Korea.

Alan H. Price, Christopher B. Weld, and Adam M. Teslik, Wiley Rein LLP, of Washington, D.C., for Consolidated Plaintiff and Defendant-Intervenor Nucor Corporation.

Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director.  Of counsel was Hendricks Valenzuela, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Kathleen W. Cannon and R. Alan Luberda, Kelley Drye & Warren LLP, of Washington, D.C., for Defendant-Intervenor ArcelorMittal USA LLC.

Stephen A. Jones and Daniel L. Schneiderman, King & Spalding LLP, of Washington, D.C., for Defendant-Intervenor AK Steel Corporation.

Thomas M. Beline and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Choe-Groves, Judge:  Plaintiff POSCO ("POSCO") and Consolidated

Plaintiff Nucor Corporation ("Nucor") initiated this action contesting various

aspects of the final determination in a countervailing duty investigation, in which

the U.S. Department of Commerce ("Commerce") determined that countervailable

subsidies are being provided to producers and exporters of certain hot-rolled steel

flat products from the Republic of Korea ("Korea").  See Countervailing Duty

Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of

Korea, 81 Fed. Reg. 53,439 (Dep't of Commerce Aug. 12, 2016) (final affirmative

determination), <u>as amended</u>, <u>Certain Hot-Rolled Steel Flat Products from Brazil</u>

<u>and the Republic of Korea</u>, 81 Fed. Reg. 67,960 (Dep't of Commerce Oct. 3,

2016) (am. final affirmative countervailing duty determination and countervailing

duty order); <u>see also</u> Issues and Decision Mem. for the Final Determination in the

Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from

the Republic of Korea (Aug. 4, 2016) ("Final IDM"), PR 444.  Before the Court

are the Final Results of Redetermination Pursuant to Court Remand, ECF No.

125-1 ("<u>Second Remand Determination</u>"), which the Court ordered following the

U.S. Court of Appeals for the Federal Circuit's opinion in a related appeal,

<u>POSCO v. United States</u> ("<u>CAFC POSCO</u>"), 977 F.3d 1369 (Fed. Cir. 2020), and

the order in the appeal of this case vacating this Court's decision and remanding,

Order (Mar. 4, 2021) ("CAFC Remand Order"), ECF No. 123.  Only Nucor and

Defendant United States ("Defendant") filed comments to the <u>Second Remand</u>

<u>Determination</u>.  Nucor Corporation's Comments Opp'n Final Results

Redetermination Pursuant Court Remand ("Nucor's Cmts."), ECF Nos. 127, 128;

Def.'s Resp. Comments Second Remand Redetermination ("Def.'s Resp."), ECF

No. 130.  For the reasons discussed below, the Court sustains the <u>Second Remand</u>

<u>Determination</u>.

## BACKGROUND

The Court presumes familiarity with the facts and procedural history of this

case and recounts the facts relevant to the Court's review of the Second Remand Determination.  See POSCO v. United States, 42 CIT __, __, 337 F. Supp. 3d 1265, 1270–72 (2018); POSCO v. United States, 43 CIT __, __, 378 F. Supp. 3d 1348, 1351–52 (2019).

    Nucor, AK Steel Corporation, ArcelorMittal USA LLC, Steel Dynamics Inc., and United States Steel Corporation filed a petition ("Petition") with Commerce concerning imports of hot-rolled steel flat products from Korea.  See Decision Mem. for the Prelim. Negative Determination: Countervailing Duty Investigation of Certain Hot-Rolled Steel Flat Products from the Republic of Korea (Jan. 8, 2015) ("Prelim. IDM") at 1, PR 298.  Commerce initiated a countervailing duty investigation into certain hot-rolled steel flat products from Korea, with a period of investigation covering calendar year 2014.  See id. at 1, 3; see also Certain Hot-Rolled Steel Flat Products from Brazil, the Republic of Korea, and Turkey, 80 Fed. Reg. 54,267 (Dep't of Commerce Sept. 9, 2015) (initiation of countervailing duty investigations).  The investigation named POSCO and Hyundai Steel Co., Ltd. ("Hyundai Steel") as the two mandatory respondents.  See Prelim. IDM at 2.  Commerce issued an initial questionnaire to the Government of Korea, seeking information about how electricity prices in Korea are set and how the Korean Electric Power Corporation's ("KEPCO") costs are reflected in its electricity rates.  See Investigation of Certain Hot-Rolled Steel

Flat Products from the Republic of Korea: Countervailing Duty Questionnaire
(Sept. 24, 2015) ("Govt. of Korea Initial Questionnaire"), PR 46–47.  The
Government of Korea responded.  Countervailing Duty Investigation: Certain
Hot-Rolled Steel Flat Products (Hot-Rolled Steel) from the Republic of Korea:
Resp. (Nov. 4, 2015) ("Govt. of Korea's Initial Questionnaire Response"), PR
112–172, 175–201.  Commerce conducted verifications of the questionnaire
responses submitted by the Government of Korea, POSCO, and Hyundai Steel.
See Final IDM at 2.  In the Final Determination, Commerce determined that the
Government of Korea's provision of electricity did not benefit POSCO or
Hyundai Steel, was not for less than adequate remuneration, and was not
countervailable.  See id. at 25, 44–50.

    In a related appeal, the U.S. Court of Appeals for the Federal Circuit vacated
and remanded "[b]ecause Commerce improperly based its benefit-conferred
analysis on a 'preferential price' standard" contrary to the law and Commerce's
failure to investigate the Korean Power Exchange (the "KPX") and include "[the]
KPX's generation costs in its analysis render[ed] its final determination
unsupported by substantial evidence."  CAFC POSCO, 977 F.3d at 1378
(discussing Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat
Products from the Republic of Korea, 81 Fed. Reg. 49,943 (Dep't of Commerce
July 29, 2016) (final affirmative determination), as amended, Certain Cold-Rolled

Steel Flat Products from Brazil, India, and the Republic of Korea ("CAFC

POSCO Final Determination"), 81 Fed. Reg. 64,436 (Dep't of Commerce Sept.

20, 2016) (am. final affirmative countervailing duty determination and

countervailing duty order).  In the appeal of this case, the U.S. Court of Appeals

for the Federal Circuit vacated and remanded consistent with its decision in CAFC

POSCO.  CAFC Remand Order at 2.  This Court remanded to Commerce for

further proceedings.  Order (Mar. 8, 2021), ECF No. 124.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff

Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), and 28 U.S.C. § 1581(c).

The Court will hold unlawful any determination found to be unsupported by

substantial evidence on the record or otherwise not in accordance with the law.  19

U.S.C. § 1516a(b)(1)(B)(i).  The Court also reviews determinations made on

remand for compliance with the Court's remand order.  Ad Hoc Shrimp Trade

Action Comm. v. United States, 38 CIT __, __, 992 F. Supp. 2d 1285, 1290

(2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

The U.S. Court of Appeals for the Federal Circuit remanded two issues:

(1) reliance on a preferential-rate standard as contrary to the law and (2) failure to

address the KPX's impact on the Korean electricity market as rendering

Commerce's cost-recovery analysis unsupported by substantial evidence.  CAFC

Remand Order; see also CAFC POSCO, 977 F.3d at 1376, 1378.

Section 1677(5) defines a countervailable subsidy as a financial contribution

provided by an authority (a foreign government or public entity) to a specific

industry when a recipient within the industry receives a benefit as a result of that

contribution.  See 19 U.S.C. § 1677(5); see also Fine Furniture (Shanghai) Ltd. v.

United States, 748 F.3d 1365, 1369 (Fed. Cir. 2014).  Before the statute was

revised by the Uruguay Round Agreements Act ("URAA"), Pub. L. No. 103-465,

§ 101, 108 Stat. 4809, 4814 (codified as 19 U.S.C. § 3511 (1994)), Commerce

applied the preferentiality standard, under which Commerce determined that a

benefit was conferred if goods or services were provided "at preferential rates."

See CAFC POSCO, 977 F.3d at 1371 (citing 19 U.S.C. § 1677(5)(A)(ii)(II)

(1988)).  The URAA "*replaced*" the preferentiality standard with the less-than-

adequate-remuneration standard.  Id. at 1376 (citing URAA, Statement of

Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 927 (1994), reprinted in

1994 U.S.C.C.A.N. 4040, 4209).  Under the current law, "a benefit shall normally

be treated as conferred . . . if [] goods or services are provided for less than

adequate remuneration."  19 U.S.C. § 1677(5)(E), (E)(iv); see CAFC POSCO, 977

F.3d at 1371.  "For purposes of clause (iv), adequacy of remuneration [is]

determined in relation to prevailing market conditions for the good or service being

provided . . . in the country which is subject to the investigation or review.

Prevailing market conditions include price, quality, availability, marketability,

transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).

Commerce codified its three-tiered, hierarchical approach for determining

the adequacy of remuneration of an investigated good or service. See 19 C.F.R.

§ 351.511. The relevant tier in this case, the third tier, provides that when no

world market price is available, "[Commerce] will normally measure the adequacy

of remuneration by assessing whether the government price is consistent with

market principles." Id. at § 351.511(a)(2)(iii). Commerce makes this

determination based on "information from the foreign government about how it

sets its price." Fine Furniture, 748 F.3d at 1370. "[I]f Commerce determines that

government pricing is not consistent with market principles, then 'a benefit shall

normally be treated as conferred.'" CAFC POSCO, 977 F.3d at 1372 (quoting 19

U.S.C. § 1677(5)(E)(iv)).

## I.    Adequate Remuneration

The U.S. Court of Appeals for the Federal Circuit held in CAFC POSCO

that Commerce's application of the pre-URAA preferential-rate standard was

contrary to the law. 977 F.3d at 1376. The CAFC POSCO court concluded that

"Commerce's analysis [] turned on whether respondents were given preferential

treatment" based on the following in Commerce's issues and decision

memorandum in that case: "If the rate charged is consistent with the standard

pricing mechanism and the company under investigation is, in all other respects,

essentially treated no differently than other companies and industries which

purchase comparable amounts of electricity, then there is no benefit." Id. at 1374

(quoting Issues and Decision Mem. for the Final Determination in the

Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from

the Republic of Korea, C-580-882 (July 20, 2016) ("CAFC POSCO Final IDM") at

46.  The court explained that "Commerce cannot rely on price discrimination to the

exclusion of a thorough evaluation of fair-market principles to determine whether a

recipient is receiving an unlawful benefit." Id. at 1376 (citing Nucor Corp. v.

United States, 927 F.3d 1243, 1251 (Fed. Cir. 2019)).

Commerce used the same standard in the Final Determination in this case as

in the final determination reviewed in CAFC POSCO.  Compare Final IDM at 44–

49, 45 ("If the rate charged is consistent with the standard pricing mechanism and

the company under investigation is, in all other respects, essentially treated no

differently than other companies and industries which purchase comparable

amounts of electricity, then there is no benefit."), with CAFC POSCO Final IDM

at 45–50.

In the Second Remand Determination, Commerce defended its standard

from the Final Determination.

> Even after determining that the industrial tariffs charged by KEPCO are
> set at rates that cover cost and provide a rate of return, a rate could
> nevertheless represent [less than fair value] if a respondent company
> consumed electricity with a contract demand of between 4kW and
> 300kW and at a voltage of 220V–380V but was charged the lower tariff
> applicable to industrial companies that had a contract demand of over
> 300kW and consumed electricity at a voltage of 345,000V or higher.
> This is the meaning of the phrase in the *Final Determination*,
> "essentially treated no differently than other companies which purchase
> comparable amounts of electricity."

Second Remand Determination at 16–17.

> [T]he statement in the *Final Determination* referenced by both Nucor
> and the CAFC indicates that when the rate charged is consistent with
> the standard pricing mechanism (in this case, the electricity tariffs
> charged to the respondent covers cost plus a return) and the respondent
> is treated no differently than other companies that purchase comparable
> amounts of electricity (in this case, the rate charged to the respondent
> is from the correct tariff classification based on its contract demand for
> electricity and voltage for that electricity consumption, as this is a
> market condition for the provision of electricity in Korea), there is no
> benefit . . . .

Id. at 31.  Because the Court of Appeals held unlawful Commerce's standard in the

Final Determination, CAFC POSCO, 977 F.3d at 1376, the Court does not

consider Commerce's argument as properly before the Court in the instant case.

The Court focuses instead on Commerce's analysis as re-articulated on

second remand:

> [I]f the tariff charged to the respondent does not cover "cost of
> production" plus "a profitable return on the investment" . . . , then the
> respondent has received a countervailable benefit under section
> [1677(5)(E)] of the Act.  Moreover, even in the event that the tariff
> charged to the respondent covers "costs of production" plus "a
> profitable return on the investment," there is still a countervailable

> benefit conferred under the statute if KEPCO charges the respondent
> less than what it should be charged under its designated tariff
> classification.

Second Remand Determination at 31; see also id. at 15–16; Def.'s Resp. at 5–8.

Nucor agrees that Commerce's re-stated methodology, "[a] government price that

covers the cost of production and supply, plus an appropriate amount for profit,

and that is not otherwise less than the respondent should be charged," is consistent

with the statutory adequate-remuneration standard and CAFC POSCO.  Nucor's

Cmts. at 4–5 (quoting Second Remand Determination at 31).

    Adequate remuneration is tied to fair value, Nucor, 927 F.3d at 1252–53, as

are "market principles of cost or pricing structures," id. at 1253 (emphasis omitted)

(quoting 19 U.S.C. § 1677(18) (defining nonmarket economy country)).  The Court

of Appeals has upheld an adequate-remuneration determination based on "familiar

standards of cost recovery."  Nucor, 927 F.3d at 1254.  Commerce's methodology

of determining whether KEPCO's tariff schedule covers costs and whether the

respondents were charged the appropriate rate according to the tariff schedule is a

reasonable measure of the adequacy of remuneration under the regulatory third tier

in assessing whether the rate that KEPCO charged the respondents is consistent

with market principles, see 19 C.F.R. § 351.511(a)(2)(iii), because it is based on

cost recovery, see Nucor, 927 F.3d at 1254.  As in Nucor, no argument was raised

about any conceptual difference between market value and cost recovery.  See id.

at 1255.

The Second Remand Determination standard is also consistent with CAFC POSCO.  The CAFC POSCO court faulted Commerce for relying on price discrimination, namely "that [a] producer is being discriminatorily favored compared to others in the exporting country."  CAFC POSCO, 977 F.3d at 1376 (quoting Nucor, 927 F.3d at 1251).  Excluding its defense of the Final Determination standard, which is not before the Court, Commerce re-articulated its standard without the language "treated no differently than other companies," which the CAFC POSCO court held was an unlawful preferential-rate standard.  See id. at 1374–76.  The Court notes Commerce's assertion that "in assessing the price charged for electricity by KEPCO to the respondents, [it] did not compare the price charged to other customers in Korea."  Second Remand Determination at 14; see also Def.'s Resp. at 8.  Commerce removed the offending preferential-rate language and did not conduct a price-discrimination analysis.

The Court concludes that Commerce's re-articulated standard is in accordance with the law.

## II.    Cost Recovery

The U.S. Court of Appeals for the Federal Circuit concluded in CAFC POSCO that "Commerce's determination that [the] KPX was not relevant to its analysis leaves unresolved whether a benefit was conferred by way of the price

charged by [the] KPX to KEPCO." <u>CAFC POSCO</u>, 977 F.3d at 1377 (citations

omitted). The <u>CAFC POSCO</u> court held that Commerce failed to discharge its

"affirmative duty to investigate any appearance of subsidies related to the

investigation that are discovered during an investigation," <u>id.</u> at 1378 (citing 19

U.S.C. § 1677d and <u>Allegheny Ludlum Corp. v. United States</u>, 24 CIT 452, 112 F.

Supp. 2d 1141 (2000)), by not considering the KPX in its cost-recovery analysis

when the "KPX is an authority" and the record showed that all electricity generated

in Korea must be sold to KEPCO by the KPX; KEPCO and its six subsidies wholly

own the KPX; and KEPCO sets its prices based on the cost of purchasing

electricity from the KPX, which accounts for up to 90% of KEPCO's total costs,

<u>id.</u> at 1377–78 (citing <u>Nucor</u>, 927 F.3d at 1259 (Reyna, J., dissenting)). In the

<u>CAFC POSCO</u> court's words, "[t]hat [the] KPX's pricing constitutes a significant

portion of KEPCO's total cost makes it implausible that Commerce adequately

investigated Korea's prevailing market condition for electricity without a thorough

understanding of the costs associated with generating and acquiring that

electricity." <u>Id.</u> at 1377. The <u>CAFC POSCO</u> court held that "Commerce's failure

to investigate and include [the] KPX's generation costs in its analysis renders its

final determination unsupported by substantial evidence." <u>Id.</u> at 1378.

    As in the <u>CAFC POSCO Final Determination</u>, Commerce excluded the

KPX's costs from its analysis in reaching the <u>Final Determination</u> in this case,

explaining:

> [W]ith respect to the costs of the generators, including the nuclear generators, the Department did not request these costs because the costs of electricity to KEPCO are determined by the KPX.  Electricity generators sell electricity to the KPX, and KEPCO purchases the electricity it distributes to its customers through the KPX.  Thus, the costs for electricity are based upon the purchase price of electricity from the KPX, and this is the cost that is relevant for KEPCO's industrial tariff schedule.

Final IDM at 49.

> The statute provides in relevant part:

> If, in the course of a proceeding under this subtitle, [Commerce] discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition, . . . then [Commerce]

> > (1)  shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding . . . .

19 U.S.C. § 1677d; see also 19 C.F.R. § 351.311.

In addition to the statute, the CAFC POSCO court cited Allegheny Ludlum Corp. v. United States ("Allegheny I"), 24 CIT 452, 112 F. Supp. 2d 1141 (2000), for the proposition that "Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation."  977 F.3d at 1378 (citing Allegheny I, 24 CIT at 461, 112 F. Supp. 2d at 1150).  On remand in that case, the court in Allegheny Ludlum Corp. v. United States ("Allegheny II"), 25 CIT 816 (2001), upheld Commerce's

determination that "while a financial contribution occurred, that contribution did

not appear to be a countervailable subsidy when the record evidence was analyzed,

revealing the absence of a benefit." 25 CIT at 825. The court explained that "the

plain language of the statute . . . only require[s] Commerce to investigate where

there is a practice that 'appears to be' or 'appears to provide' a countervailable

subsidy." Id. at 821. The statute requires Commerce to "review the record,

weighing and analyzing both negative evidence and positive evidence, to

determine whether the business practice appears to be a countervailable subsidy,"

but "does not force Commerce to fully investigate any subsidy." Jiangsu Zhongji

Lamination Materials Co. v. United States, 43 CIT __, __, 405 F. Supp. 3d 1317,

1342 (2019) (internal quotation marks and brackets omitted) (quoting Allegheny II,

25 CIT at 824).

 Nucor argues also that the Second Remand Determination is unlawful

because it "treat[s] the 'prevailing market conditions' in Korea as coextensive with

'the tariff classifications established by KEPCO' and do[es] not properly expand

the analysis to include additional information regarding the KPX or actual

generation costs." Nucor's Cmts. at 11–12. Nucor contends that Commerce relied

only on the Government of Korea's responses to two questions in the Govt. of

Korea Initial Questionnaire[1] that addressed KEPCO's cost of purchasing electricity

---

[1] The two questions posed by Commerce were:

through the KPX but not the cost of generating electricity.  Id. at 12 (citing Second
Remand Determination at 17); see also Govt. of Korea Initial Questionnaire,
Section II, Questions 40–41.  Nucor asserts that the deficiency identified in CAFC
POSCO remains because the Second Remand Determination "include[s] no
additional information or analysis regarding the actual costs of generating and
supplying electricity."  Nucor's Cmts. at 13.

　　　Nucor's assertions are inaccurate.  As Defendant asserts, Commerce did not
rely only on the Government of Korea's responses to two questions in the Govt. of
Korea Initial Questionnaire.  See Def.'s Resp. at 9.  In the Second Remand

---

　　　　KEPCO pays its subsidiaries the generating cost when it purchases
　　　electricity at the [KPX] and that the capital and generating costs are
　　　included in the purchase price.  If the price paid is not sufficient to cover
　　　all the costs including the amount of investment return, please explain
　　　the costs that are not covered and provide the additional amount that
　　　would need to be paid to cover all costs including an appropriate
　　　amount of investment return.  Please make sure to also provide this
　　　additional amount in percentage terms.

Govt. of Korea Initial Questionnaire, Section II, Question 40.

　　　　The price of electricity from the KPX reflects an adjusted coefficient
　　　that is determined by the Cost Evaluation Committee.  Please explain
　　　how the adjusted coefficient was determined; how often the adjusted
　　　coefficient is changed; and provide the adjusted coefficients that were
　　　in effect during the [period of investigation].

Govt. of Korea Initial Questionnaire, Section II, Question 41.

Determination, the Court observes that Commerce also cited information from

KEPCO's 2015 Form 20-F covering calendar year 2014, which was filed with the

U.S. Securities and Exchange Commission and was submitted with the Govt. of

Korea's Initial Questionnaire Response. [2]  Second Remand Determination at 39 &

nn.139–41, 40 & nn.142 & 144, 41 & n.147 (citing Govt. of Korea's Initial

Questionnaire Resp. Ex. E-3 ("KEPCO's 2015 Form 20-F")).  The additional

information from KEPCO's 2015 Form 20-F went beyond KEPCO's rate-setting

methodology and included the subsidiaries' costs of generating electricity and the

KPX's costs in administering sales of electricity to KEPCO, as required by CAFC

POSCO.

     The KPX does not generate electricity.  Id. at 32 n.115 (citing Govt. of

Korea's Initial Questionnaire Response at 9).  As the CAFC POSCO court noted,

electricity in Korea is "generated by 'independent power generators, community

---

[2] Commerce also referenced Certain Hot-Rolled Steel Flat Products from the
Republic of Korea: Final Results of Countervailing Duty Administrative Review,
2017 ("2017 Administrative Review of Hot-Rolled Steel"), 85 Fed. Reg. 64,122
(Dep't of Commerce Oct. 9, 2020), in which Commerce investigated the selling of
electricity to KEPCO through the KPX, "in the event that the Court wanted
additional information with respect to '[the] KPX's generation costs.'"  Second
Remand Determination at 40; see also Def.'s Resp. at 12–13.  Nucor argues that no
upstream subsidy allegation was made during this investigation and Commerce's
upstream subsidy determinations in subsequent administrative reviews are
irrelevant here.  Nucor's Cmts. at 14–15.  Because the Court concludes that
evidence on this record supports Commerce's determination, the Court does not
consider the 2017 Administrative Review of Hot-Rolled Steel.

energy systems, and KEPCO's six subsidiaries.'"  977 F.3d at 1373.  "Commerce found [that] KEPCO, through its six subsidiaries, generates the 'substantial majority of the electricity produced in Korea.'"  Id.  Therefore, it was reasonable for Commerce to use the average fuel costs of KEPCO's electricity-generating subsidiaries as reflected in KEPCO's 2015 Form 20-F for the costs of generating electricity.  See Second Remand Determination at 39.  The Court concludes that Commerce complied with CAFC POSCO in considering additional information from the record regarding the costs of generating electricity.

Commerce also complied with CAFC POSCO in reviewing the record on second remand and determining, as in Allegheny II, that there was no appearance of a subsidy provided by the KPX.  Commerce explained that for the purpose of determining whether a practice appears to be a countervailable subsidy that triggers its obligation under Section 1677d, Commerce considered whether the practice appeared to have the three elements of a countervailable subsidy: "(1) a financial contribution that (2) confers a benefit which (3) is specific."  Second Remand Determination at 7–8.  Commerce acknowledged that the KPX is an authority that provided a financial contribution and that the Petition alleged possible specificity, but Commerce determined that there was no evidence of a benefit conferred in the pricing between the KPX and KEPCO, and therefore no appearance of a countervailable subsidy provided by the KPX that Commerce was required to

include in the proceeding. Id. at 8. Commerce determined that the KPX's prices paid by KEPCO exceeded the KPX's full cost, including the cost paid by the KPX to the generators to cover the cost of generating electricity, and therefore did not constitute a benefit under 19 U.S.C. § 1677(5)(B). Id. at 18–19; see also Def.'s Resp. at 10. The Court concludes that Commerce complied with CAFC POSCO in analyzing the KPX's costs and answering, in the negative, the CAFC POSCO court's question of "whether a benefit was conferred by way of the price charged by [the] KPX to KEPCO." See CAFC POSCO, 977 F.3d at 1377.

Nucor argues that Commerce's determination fails because it considered the profitability of KEPCO and KEPCO's generation subsidiaries only "in the aggregate," in other words, based on "all sales to all users" and not specifically with respect to sales to the respondents. Nucor's Cmts. at 15–16. As Defendant argues, however, Commerce did not base its determination solely on KEPCO's overall profitability as Nucor asserts. See Def.'s Resp. at 9–10. As discussed above, Commerce determined that KEPCO based the rates *for each electricity classification* on its overall costs as calculated and distributed to customers based on contract demand, voltage, hours of use, time of day (off-peak, mid-peak, on-peak), season, and number of consumers for each classification of electricity. See supra pp. 17–18. Commerce's consideration of KEPCO's cost recovery in the context of these factors is consistent with the statute's instruction for Commerce to

determine the adequacy of remuneration "in relation to prevailing market conditions," including "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." <u>See</u> 19 U.S.C. § 1677(5)(E).

Nucor contends that "KEPCO's pricing structure creates *de facto* cross-subsidization, through which the majority of society . . . pays the highest government-assigned prices in order to cover the fixed costs that are excluded from the [low] government-assigned prices paid to generators supplying electricity to off-peak, industrial consumers like the mandatory respondents." Nucor's Cmts. at 16–17 (citation and internal quotation marks omitted). But on the contrary, the mandatory respondents purchased electricity at all three rates, "Off-Peak," "Mid-Peak," and "On-Peak," not only, or even overwhelmingly, at the lowest off-peak rates. <u>See</u> Certain Hot-Rolled Steel Flat Products from Korea, Case No. C-580-884: [POSCO's] Initial Questionnaire Resp. (Nov. 2, 2015), CR 41–84, Ex. A-2 ("POSCO's Electricity Template"); Certain Hot-Rolled Steel Flat Products from Korea, Case No. C-580-884: [Hyundai Steel's] Section III Initial Questionnaire Resp. (Nov. 6, 2015), CR 193–237, Ex. A-1 ("Hyundai Steel's Electricity Template"). As Commerce noted in the Final IDM, "[t]he fact [that] [the] respondents operate their production facilities 24 hours a day and consume large amounts of electricity during the evening hours is more evidence of supply and demand than any [benefit]." Final IDM at 44. And it would seem that setting

lower rates for lower demand during off-peak hours is consistent with market principles rather than being a hallmark of "*de facto* cross-subsidization" as asserted by Nucor.  See Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984) ("Market prices of commodities and most services are determined by supply and demand.").

Comparing the lowest monthly off-peak rate paid by a mandatory respondent to the annual average cost for the lowest cost generator, Nucor asserts that the record shows that the off-peak rates paid by the respondents do not cover costs.  See Nucor's Cmts. at 17 (citing POSCO's Electricity Template; Hyundai Steel's Electricity Template; Second Remand Determination at 39 n.140).  Nucor's mismatched comparison of the lowest variable *monthly* off-peak rate paid by a mandatory respondent to the *annual average* cost for the lowest cost generator does not undermine the record evidence that supports Commerce's determination. That the lowest monthly rate was lower than the annual average cost provides no information to confirm or discredit the generator's cost recovery that month or that year.

Commerce also complied with CAFC POSCO in considering the costs of acquiring electricity through the electricity supply chain.  By Korean law, "[a]ll electricity generated in Korea, including that of the private generators, must be sold to KEPCO," through the KPX.  CAFC POSCO, 977 F.3d at 1373; Second Remand Determination at 32 n.115 (citing Govt. of Korea's Initial Questionnaire

Response at 9).  The KPX, "a wholesale market," "which is wholly owned by KEPCO and its six subsidiaries," administers "all sales of electricity in Korea." CAFC POSCO, 977 F.3d at 1373.  "[E]lectricity generators 'sell' electricity to [the] KPX and then KEPCO 'purchases' that electricity from [the] KPX . . . ." Second Remand Determination at 38 n.136 (citing Final IDM at 49).  "KEPCO is a state-owned entity and the sole provider of electricity in Korea." CAFC POSCO, 977 F.3d at 1378.  "KEPCO purchases electricity from the KPX and transmits and distributes to the customers." Second Remand Determination at 32 n.115 (citing Govt. of Korea's Initial Questionnaire Response at 9).

For KEPCO's subsidiaries, Commerce compared each subsidiary's average price per kilowatt hour (the price paid to the subsidiary by the KPX) to its average fuel cost per kilowatt hour, as disclosed in KEPCO's 2015 Form 20-F, and determined that "it is readily apparent that the KPX unit price more than covered the fuel costs for each of these generators." See id. at 39 & n.140.  Commerce also noted that all six subsidiaries were profitable in 2014 and five subsidiaries distributed cash dividends.  Id. at 40.

For the KPX, Commerce explained that "the only revenue permitted is membership fees, commission on electricity utility transactions and other revenue proscribed by [the Ministry of Trade, Industry and Energy] and its financial statements establish revenue from commissions more than covered its operating

expenses." Id.  Commerce determined, based on KEPCO's 2015 Form 20-F, that

the KPX recovered costs during the period of investigation.  Id.

For KEPCO, the CAFC POSCO court noted that "[w]hile KEPCO and other

government entities establish the ultimate prices to end users, the basis of these

prices is the cost of KEPCO's purchases from the KPX," CAFC POSCO, 977 F.3d

at 1373, "and [the] KPX's pricing accounts for upwards of 90% of KEPCO's total

cost," id. at 1377 (citations omitted).  Commerce reviewed KEPCO's industrial

tariff electricity schedule, which designated rates based on contract demand,

voltage, hours of use, time of day (off-peak, mid-peak, on-peak), and season.

Second Remand Determination at 12–13 (citing Final Determination at 44–50;

Govt. of Korea's Initial Questionnaire Response Ex. E-13 ("KEPCO's Electricity

Schedule")).  Commerce explained that it calculated the "cost for each electricity

classification" by: "(1) distributing the overall cost according to the stages of

providing electricity (generation, transmission, distribution and sales); (2) dividing

each cost into fixed cost, variable cost, and the consumer management fee; and

(3) then calculating the cost by applying the electricity load level, peak level, and

the patterns of consuming electricity." Id. at 13.  Commerce reviewed the Govt. of

Korea's Initial Questionnaire Response, which explained that the industrial tariff

classifications were segregated by contract demand, either 4–300kW or more than

300kW, and by voltage, Low Voltage (220–380V), High Voltage (A) (3,300–

66,000V), High Voltage (B) (154,000V), or High Voltage (C) (345,000V or

higher).  Id. at 12–13 (citing KEPCO's Electricity Schedule).  The higher the

contract demand and the higher the voltage, the lower the industrial rate.  Id. at 13.

Commerce determined that, in addition to "the electricity load level, the usage

pattern of electricity, and the volume of electricity consumed," KEPCO distributed

costs "according to the number of consumers for each classification of electricity."

Id. (citing Final IDM at 49).  Commerce repeated its determination and explanation

from the Final Determination that KEPCO developed its electricity schedule based

on its costs.  Id.  Commerce determined that the method used to set KEPCO's

industrial tariff schedule was based on price, marketability, transportation, and

other conditions of purchase or sale, which constituted prevailing market

conditions within the meaning of Section 1677(5)(E)(iv).  Id. at 12.

    Commerce then considered whether the tariff classification rate charged to

the respondents covered KEPCO's costs and whether the respondents were

assigned to the appropriate tariff classification.  Id. at 12, 15–17.  Commerce

concluded again that for the period of investigation, KEPCO more than fully

covered its cost for the industrial tariff applicable to the respondents.  Id. at 13–14

(citing Final IDM at 49).  Commerce determined based on KEPCO's 2015 Form

20-F that "KEPCO, as a consolidated entity, was profitable and its revenue was

positive in transmission, distribution and power generation (nuclear and non-

nuclear)." Id. at 39.  Commerce determined that KEPCO "not only [recovered] the

cost of production, but also [secured] a return on investment."  Id. at 40.

Commerce's determinations that the subsidiaries, the KPX, and KEPCO

recovered their costs and secured returns on investment was supported by

KEPCO's 2015 Form 20-F.  See Second Remand Determination at 12–13 (citing

KEPCO's Electricity Schedule), 39 & n.140 (citing KEPCO's 2015 Form 20-F),

40.  The Court concludes that Commerce's determination that the provision of

electricity to the respondents was not for less than adequate remuneration is

supported by substantial evidence and complies with CAFC POSCO.

## CONCLUSION

For the aforementioned reasons, the Court sustains Commerce's Second

Remand Determination.

Judgment will be entered accordingly.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:    June 13, 2022    
            New York, New York